Arthur D. MORSE, Plaintiff,

v.

Sidney FIELDS and Hearst Corporation, Defendants.

United States District Court,
S. D. New York.
Dec. 16, 1954.

Rosenman & Mandel, New York City, for plaintiff. Philip Mandel, Roslyn, N. Y., of counsel.

McCauley & Henry, New York City, for defendants. Alfred H. Wasserstrom and Harvey L. Lipton, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

This is an action for damages for copyright infringement which has been tried by the Court without a jury.[1] The plaintiff is the author of an article entitled " 'Hopalong' Abramowitz", which appeared in the September 30, 1950 issue of Collier's Magazine. Defendant Fields was the author of a column entitled "H. Hopalong Abramowitz: Cowboy in the Bronx", which was published by the defendant Hearst Corporation on September 17, 1951 in its newspaper, the Daily Mirror. Plaintiff claims that Fields' article infringed his copyrighted article.

Both articles concern themselves with the life and exploits of Abramowitz. Abramowitz is a very colorful individual who owns a stable in the Bronx which houses a vast array of horses and every conceivable type of carriage and stagecoach, all of which are used for advertising everything from an aspiring politician's candidacy to the opening of a neighborhood delicatessen. Some of the incidents in Abramowitz' life are very homely and humorous and are reflected in both articles.

The defendants' answer directly puts in issue the originality of plaintiff's work and the procedural regularity of the registration of the copyright on plaintiff's work. Defendants, in addition to a denial of copying, contend that if there was any copying that such copying constituted a fair use of plaintiff's work. They also maintain that the plaintiff is estopped from raising any alleged infringement.

I shall first dispose of defendants' contention as to the procedural irregularity of the copyright registration which, I believe, has no merit. The defendants admit, and the proof establishes (Plaintiff's Exhibits 5 and 6), that Collier's Magazine obtained a registered copyright in its name on September 25, 1950 for its September 30th issue, and that it assigned all its right, including infringement claims, in plaintiff's article to the plaintiff on October 17, 1951. The nub of the defendants' claim is that plaintiff never assigned all of his rights to Collier's before the latter obtained its copyright. The legal theory of this claim is clear and correct: that only the "proprietor" of a work may copyright it; that a person to whom the right to copyright is assigned is a proprietor, American Tobacco Co.

---

[1]. The parties, by stipulation, agreed to waive a jury and to limit damages, if any, to the statutory limits of no less than $250 and no more than $5,000.

v. Werckmeister, 1907, 207 U.S. 284, 296, 28 S.Ct. 72, 52 L.Ed. 208, but a mere licensee cannot copyright a work. Egner v. Schirmer Music Co., 1 Cir., 1943, 139 F.2d 398. Cf. Mifflin v. R. H. White Co., 1903, 190 U.S. 260, 263, 23 S.Ct. 769, 49 L.Ed. 1040. Moreover, a general copyright in an issue of a periodical (a "blanket" copyright) does not protect the rights in a particular contributed article unless such rights had been previously assigned to the publisher. Mail & Express Co. v. Life Pub. Co., 2 Cir., 1912, 192 F. 899.

■ I find here, however, that the plaintiff did assign his right to copyright to Collier's before the latter obtained its copyright. Plaintiff's testimony establishes that the firm of Pritchett and Brandt were his general agents with full power to negotiate the sale of his article to interested publishers and to arrange, by any method deemed feasible to his agents, to grant only first publication rights to such publishers. It is apparent that the method employed and the practice followed by his agents was to assign all rights to Collier's in the first instance under the express condition that, after registration of the copyright in its own name, Collier's would reassign all rights to the plaintiff. This is unequivocally confirmed by the memorandum attached to the check received by plaintiff from Collier's on November 28, 1949 (Plaintiff's Exhibit 7).[2] Ultimately, Collier's formally assigned all rights in the copyright to plaintiff.

■ The next contention of the defendants is that the plaintiff's work was not copyrightable because it was not original. Viewing plaintiff's work as a unit, this contention cannot be maintained. Although plaintiff admits that some newspaper articles had been written about Abramowitz prior to his work, it is clear from his testimony that he did not copy these works but that his article was based upon information received from at least fifteen hours devoted to interviewing Abramowitz and upon 35 hours consumed in the actual writing process. The cryptic and laconic notes which plaintiff took during the interviews were received in evidence. (Exhibits 1-A, 1-B and 1-C). A comparison of these notes with plaintiff's finished product as a unit clearly indicates that the plaintiff has implanted his own writing style and form of expression upon the latter. Baker v. Selden, 1879, 101 U.S. 99, 25 L.Ed. 841; Jewelers Circular Pub. Co. v. Keystone Pub. Co., 2 Cir., 1922, 281 F. 83, 88, 26 A.L.R. 571; Gerlach-Barklow Co. v. Morris & Bendien, 2 Cir., 1927, 23 F. 2d 159. The defendants urge that the Court should not view the plaintiff's article as a unit in determining its originality but should first consider each part, separately and determine whether each particular part is original and copyrightable, and then exclude the unoriginal parts in determining the issue of infringement. In this connection the Court now refers to the Appendix to this opinion which includes, in columns A and B, a parallel column analysis of the parts of plaintiff's work which he claims the defendants infringed.

■ It is clear that the copyright laws only protect those parts of plaintiff's work which are original and copyrightable, and that bare facts or "news" are not protected. However, the style and form of their presentation is protected. International News Service v. Associated Press, 1918, 248 U.S. 215, 234, 39 S.Ct. 68, 63 L.Ed. 211; Chicago Record-Herald Co. v. Tribune Ass'n, 7 Cir., 1921, 275 F. 797; see Dymow v. Bolton, 2 Cir., 1926, 11 F.2d 690, 691; Oxford Book Co. v. College Entrance Book Co., 2 Cir., 1938, 98 F.2d 688, 691. And that this should be so is grounded upon sound reason.

2. "Received from (Collier's) the above sum as payment * * * for the * * * work entitled Stagecoach in the Bronx by Arthur D. Morse and all literary property and other rights therein, including complete publication rights and the right to copyright the same in (Collier's) name * * *. After publication, (Collier's) upon request will transfer and assign to the author all rights in and to the copyright secured on said work. (Signed by Pritchett)."

For, the law seeks to encourage creative minds. The Court has summarized in its Appendix, column D, the defendants' contentions with respect to the designated summaries of plaintiff's assertions carried in column C. On the other hand, it is just as clear that the fact of copying may be proven by similarity between both the protected and unprotected parts of plaintiff's and defendant Fields' work.[3] The Court should reach the problem of eliminating from consideration the unprotected part of a plaintiff's work only if and when it finds that the defendant has copied and the issue of improper appropriation—substantiality or materiality—is properly before it. It will soon be apparent that as a result of the Court's disposition of the present litigation, on the grounds stated, it will not be necessary to rule upon the issue of substantiality or materiality or the other claims of the defendants.[4]

With respect to the crucial issue of copying, the plaintiff relies upon circumstantial evidence of copying, i. e. access and similarity. Since the parties have stipulated that the national circulation of the September 30, 1950 issue of Collier's was over three million copies, the bare opportunity to copy is not strongly contested. However, the plaintiff has not presented any direct evidence that Fields actually saw plaintiff's work before he wrote his own. The complete availability of plaintiff's work is merely some circumstantial evidence of access, and access is merely circumstantial evidence of copying. Against this double circumstantial evidence, defendant Fields' testimony specifically denying that he ever saw plaintiff's article must be weighed. With the evidence so posited, the plaintiff is entitled to little benefit from the "inverse ratio" rule to the effect that when access is established a lesser degree of similarity is required. See Golding v. R.K.O. Pictures, Inc., Cal. 1949, 208 P.2d 1, 3.

In respect to similarity as evidence of copying, the plaintiff primarily relies upon the parallel analysis chart which he has prepared and which has been received in evidence, and which purports to show, by comparison of particular parts of plaintiff's and defendant Fields' articles, the similarity between the two. See Appendix, columns A and B. The plaintiff, an experienced and intelligent journalist, was permitted to give expert testimony on the issue of copying and his opinions rendered in court in this respect have been summarized in column C of the Appendix. Such "dissection" of both works by use of a parallel column analysis and expert testimony has been expressly approved in this Circuit when it is utilized in the determination of the issue of copying but not when it is offered with respect to the issue of unlawful appropriation or substantiality or materiality. Arnstein v. Porter, 2 Cir., 1946,

3. Although the title of plaintiff's work is not protected, it has been considered by the Court on the issue of copying. The name "Hopalong" appears in both titles but its significance evaporates because, although Collier's itself created this nickname for Abramowitz, ever since the publication of plaintiff's article, Abramowitz personally has widely used the nickname in his business (Defendants' Exhibit F) and he is so listed in the telephone book.

The importance of permitting a plaintiff to show similarities between all of the parts of his work, both the protected and unprotected parts, and the defendants' work rather than limiting similarity comparisons to only the protected parts of a plaintiff's work is best illustrated by a hypothetical situation. If we assume that there is but one sentence of a plaintiff's work which is both protected and material and the vast residue is unprotected, and the claim is the copying of this one sentence by evasion, obviously a holding which excludes a showing of identity or close similarity between the vast unprotected residue of plaintiff's work and the bulk of a defendant's work would eliminate any possibility of a finding of copying of the one protected sentence.

4. These contentions are that certain portions of plaintiff's work are not protected because they are either bare factual recitals or quotations attributed to Abramowitz which, if they are not statements of mere fact, were held out as such by the plaintiff, thereby estopping him from claiming that they are protected. See Appendix, column D.

154 F.2d 464, 468; Heim v. Universal Pictures Co., 2 Cir., 1946, 154 F.2d 480, 488, note 9.

 I find that the plaintiff has failed to prove copying by a fair preponderance of the evidence. Plaintiff relies upon the similarities shown in his comparison charts (Appendix, columns A and B), his inferences based upon it (Appendix, column C), and the complete availability of his article to potential copiers. Against this circumstantial evidence of copying I must weigh the evidence of the defendants. Fields, although an interested witness, appeared to me to be frank and credible. He specifically denied copying and insisted that he had never seen nor heard of plaintiff's article at any time before his article was published. Plaintiff concedes, and the testimony of Fields and Abramowitz establishes, that Fields personally interviewed Abramowitz on July 26, 1951, for approximately two hours and that Abramowitz related to Fields practically every accused factual component included in Fields' article, and that Abramowitz specifically repeated to Fields many of the phrases which appear in both articles and to which plaintiff claims originality. (See Appendix, columns E, F and H.) Fields took notes during the interview (Defendants' Exhibits E and E–1) which corroborate my finding that all of the factual components and most of the portions of allegedly original language or forms of expression in Morse's article which appear in Fields' article were obtained by Fields in his interview with Abramowitz. (See Appendix, columns A, B, G and H.) It is more probable that Fields used his own notes rather than Morse's article for his recitation of facts. Fields has been writing for the Mirror for over 14 years. He has had vast experience in writing "interview columns" based upon adequate notes recorded during the interview which are then expanded into draft form and later condensed and edited into a final copy of approximately 750 words. Indeed, his specialty is profile or interview columns, and he is widely known for these columns.

It is contended that the identity between 'Fields' original notes and his final article resulted from a post litem motam alteration by Fields of his original interview notes, and that Fields' copying occurred at or before the time he wrote his draft and is reflected in the draft. (Defendants' Exhibit G.) Plaintiff seeks to prove by comparisons among plaintiff's final article, Fields' notes, draft and final article 4–A that Fields' draft has greater similarity to plaintiff's published article than the former bears to Fields' notes; that Fields' draft includes items which are not even hinted at in his notes but are included in plaintiff's article, and that Fields' notes possess greater similarity to Fields' final article than to Fields' draft. Assuming this to be true, we are asked to draw the inference, inter alia, that Fields' draft was copied from plaintiff's article and that Fields, to conceal this copying, altered his notes post litem motam to make them conform more closely to his final article. This contention is incredible and apart from the mere charge I find nothing to substantiate it. It is reiterated, that Abramowitz testified that every incident included by Fields in his article which is alleged to have been copied was related by Abramowitz to Fields. Moreover, common sense would dictate that a highly experienced journalist and interviewer, such as Fields, would have no need to resort to plaintiff's article for his material, if he followed his long-established practice (as he did in the instant case) of taking detailed notes at the time of the interview. The two-hour length of his interview was ample time for the recordation of all that appears in his notes and for the writing of an article of 750 words. It seems probable that if Fields had such a predatory motive he would have destroyed, rather than have offered to the plaintiff, his draft which is the heart of the charge. Plaintiff contends that Fields did not destroy it because he did not appreciate

4–A. Plaintiff's Exhibit 10.

such subtleties. This argument is without weight and is not borne out by the evidence. Fields testified that, at his first conference with his attorney which took place one or two days after he learned of the institution of this action, these issues and alleged inconsistencies were fully explored and recognized by Fields and his attorney.

The inclusion of certain items by Fields in his draft which are not included in his notes are best explained by the very process Fields uses to write his articles. His cryptic notes are expanded into sentence and paragraph form in his draft. This is a clear example of the use, in everyday life, of memoranda to refresh one's memory. An experienced interviewer records key phrases in his interview notes which, at the time he prepares his draft, refresh his recollection of facts and things said at the interview which have not been fully recorded. In no case are the incidents in the draft or article inconsistent with his notes; the draft and final article merely add color and shadings to the facts and quotations included in the notes.

Instead, the similarities between plaintiff's article and Fields' article and draft result from the use of a common source by both writers. (See Appendix, columns A through K.) The plaintiff counters, however, with the contention that since Abramowitz has led a full and colorful life, there are a wealth of humorous and interesting incidents upon which Fields could have drawn for his article, and that Fields' selection of the same incidents which plaintiff has included in his article and the similarity of sequence could not have resulted from mere coincidence but only from copying. The Court refers to its factual analysis of this contention in the Appendix, columns J and K. The contention is factually untenable. It will be observed that Fields has included in his article many incidents and facts which are not included in plaintiff's article. (See Appendix, column K, items 4, 5, 7, 8 and 13.) A few of these incidents are given major emphasis by Fields in his article. Similarly, the plaintiff has included many incidents not found in Fields' work. (See Appendix, column J, items 1, 6, 8, 11, 13 and 14.) In fact, one incident which plaintiff includes, and is not included in the Fields article, may be characterized as the major anecdote in plaintiff's article. (See Appendix, column J, item 11.) Moreover, Fields has one incident recorded in his notes which appears in plaintiff's article and was excluded by Fields from his published article. (See Appendix, column J, item 14.) I conclude from this dissective analysis that from the "wealth" of incidents in Abramowitz' life, Fields' selection and emphasis is not so substantially similar to that of plaintiff's when both final articles are compared with each other and when what Fields knew of Abramowitz' life, as evidenced by his interview notes, is compared with Fields' final article, that we are led to the conclusion that there was copying. In addition, the "wealth" of incidents theory of plaintiff is not a substantial one as applied to the facts here. Certain incidents in Abramowitz' life are certainly more "newsworthy" than others, and Abramowitz, who is now an experienced interviewee by reason of the many interviews he has granted to writers, has come to realize which incidents and anecdotes are the most interesting and deserving of repetition and stress. Many of the incidents included in both articles are so much more humorous or interesting than others that it may be assumed that experienced journalists, as Morse and Fields are (specialists in "human interest" stories) would include them, to a greater or lesser degree, with the same salient facts. Moreover, the "common source" of both writers, Abramowitz, cannot be overlooked. Abramowitz had been interviewed by the plaintiff and others before Fields interviewed him.[5]

5. It should be noted in this respect that the potential scope of originality of expression and treatment is far more limited when the subject matter concerns the true life exploits of a contemporary stable proprietor in the Bronx and the primary

Abramowitz was, in a sense, a public figure before Fields discovered him. It is likely, as I have indicated, that Abramowitz had developed some sort of format or pattern in describing the incidents in his life to reporters, including especially those incidents to which he had previously received highly favorable reactions from reporters,[6] friends, and others, and excluding the obviously banal and trite incidents. This emphasis by Abramowitz of only the highlights of his life would be more probable in a two-hour interview, which Fields conducted, when compared with the series of leisurely interviews which the plaintiff conducted.

For a plaintiff to establish, as he must, to a reasonable degree of certainty, the charge of piracy by a defendant it is not enough that upon dissection there appear superficial similarity in some instances, where there are compelling reasons to believe that the similarity is the result of the causes already enunciated. "To sustain it * * * more must appear than mere similarity or even identity, of the supposed infringement with the part in question. In this lies the one distinction between a patent and a copyright.

One may infringe a patent by the innocent reproduction of the machine patented, but the law imposes no prohibition upon those who, without copying, independently arrive at the precise combination of words or notes which have been copyrighted." Fred Fisher, Inc., v. Dillingham, D.C.S.D.N.Y., 1924, 298 F. 145, 147, L. Hand, J. Such highly circumstantial evidence as has been presented here by the plaintiff cannot suffice to sustain this charge in the face of direct proof to the contrary.

■ Judgment is awarded to the defendants dismissing the complaint. In the exercise of my discretion I shall deny counsel fee. 17 U.S.C. § 116. The plaintiff's claim was not capricious or unreasonable and I have reached my conclusion only after a thorough and difficult consideration of the evidence and the multitude of inferences to be drawn therefrom which were strongly advocated by both sides. Cf. Official Aviation Guide Co. v. American Aviation Associates, 7 Cir., 1947, 162 F.2d 541, per Minton, J.

The foregoing opinion contains my findings of fact and conclusions of law.

---

purpose of the works is human interest reporting for mass-media periodicals than when a play, poem or novel is to be created out of whole cloth and the prospective authors are presented with infinite choices as to time, setting, characters, theme, dialogue and intellectual depth of treatment. Therefore, evidence of similarities between works of the former class must necessarily be far more striking than the similarities between works of the latter class before the Court can from a fair preponderance of the evidence find that copying as to the former class has occurred. Any current play which centers upon Hamlet's Elsinore and the irresolution of the Prince of Denmark treads on insecure ground; a writing which treats of a current Hollywood personality always walks free unless its footprints are revealed on a lower step on the pyramid of publicity.

6. Indeed, Abramowitz had the benefit at the time of Fields' interview of seeing what incidents and anecdotes Morse, an experienced writer, had thought most interesting, for his article had already been published in Collier's at the time of the Fields interview.

# APPENDIX

## Comparison of Published Articles

| Column A | Column B |
|---|---|
| Morse Article | Fields. Article |
| Title: "Hopalong" Abramowitz | Title: H. Hopalong Abramowitz |

1. The collection, which fills five lots, includes hundreds of covered wagons, buckboards, surreys (with and without fringes), tallyhos, phaetons, victorias, pony traps, broughams, landaus and barouches.

1. He has the largest collection of carriages, buckboards, surreys, phaetons, tally-hos, barouches, landaus, or pony expresses in the country, if not the world.

2. Abramowitz himself, in perpetual motion among his animals, is five feet four and pudgy, with a bull neck and bowed legs. Since his sixty-second birthday he has cut his working time at the stable to 20 hours a day, seven days a week.

2. Hopalong is a stocky, bow-legged five-feet-four, and always dresses in cowboy clothes * * * Even at 63, with three grown children and five grandchildren, his energy is astonishing. Last year he slowed up; he cut his working hours down to 18 a day, but still labors seven days a week.

3. "My horses have never let me down, why should I quit on them? They got to be fed and watered and who should do it but Abramowitz?"

3. "Quit!" The word was like a slap. "All my life I been around horses. Born and raised in it. Business or no business, the animals you got to clean and feed and water them. They never let me down. Why should I let them down?"

4. Beginning as a fruit-peddler * * * (several paragraphs later) * * * His bride, the lovely Fanny Busell, agreed that he should rent a stable, but at that moment there wasn't a penny in the house. Finally they made a tearful decision—they would pawn Fanny's engagement ring. It brought $110, of which $100 immediately went for a month's rent and a month's security on the stable.

4. After a whirl as a fruit peddler he pawned the engagement ring of his pretty wife, Fanny, for $100 and began his horse and wagon empire.

Column A

Column B

Morse Article

Fields Article

5. "I paid $65,000 cash for a stable, but I forgot to take out fire insurance and the next day the stable burned down. The depression and the fire came at the same time."

5. "I forgot to take out fire insurance," he says, "and nobody ever invented depression insurance."

6. When a rodeo arrived at Yankee Stadium the Westerners wanted to rent a number of Abramowitz' carriages. Harry, however would not trust cowboys with his stagecoaches; he insisted on driving them himself; and, with a cowboy hat perched on his balding head, Abramowitz raced his coaches around the infield at break-neck speed while the cow hands gaped and the spectators applauded the daredevil from the Bronx prairie.

6. Not too long ago a rodeo at Yankee Stadium needed a covered wagon and the proper horses to go with them. Naturally they rented them from Harry "Hopalong" Abramowitz, the Bronx Cowboy. Hopalong drove the wagon at racetrack speed around the stadium to the gaping admiration of cowboys and spectators alike. "When it comes to big stuff like a rodeo or a parade," Hopalong says, "I don't trust any driver. I drive myself."

7. Recently he pushed a donkey up five flights of stairs ("It wouldn't go in the elevator") to a birthday party for columnist Dorothy Kilgallen. "That donkey made friends with everybody," Abramowitz reported. "He went from table to table eating the finest foods and he was so polite he behaved like a real gentleman."

7. "When Dorothy Kilgallen has a birthday party I got to push a donkey up five flights of stairs. He wouldn't go in the elevator. But in the party he acts like a regular gentleman."

8. Norma, his widowed daughter, says he won't admit that during the depression he sold one of his best horses to buy a dress for her graduation dance. And Shirley, another daughter, remembers how he parted with another favorite so the kids would have a set of encyclopedias. Louis, the son who never liked the stable business, is a successful farmer in Connecticut and his three years of college were also financed by the surreptitious sale of the horses and wagons that were Harry Abramowitz' life.

8. Yet, with his great love for his animals, he sold one of his best horses so his kids could have a set of encyclopedias. He sold another so one of his daughters could have a new dress for her graduation prom. And he sold a flock of his animals to pay three years of college bills for his son. He never said anything about it. It was like parting with his own hide.

72

Column A | Column B
---|---

**Morse Article**

9. The carriages are hired mostly to advertise movies, neighborhood stores, political candidates and products from bread to worsteds * * * "You'll excuse me now, I got to get a surrey ready for a supermarket." * * They have lost some of their standing in the carriage trade, but they're marvelous for announcing the Grand Opening of a delicatessen.

**Fields Article**

9. Along with his stock of 25 horses, 20 donkeys and ponies, and a dozen goats, Hopalong rents them out to advertise delicatessens, supermarkets, movies, political candidates, or English woolens.

Column C | Column D
---|---

**Plaintiff's Opinion Testimony Summarized (Column F summarizes the Court's analysis of this)**

**Defendants' Characterization of Plaintiff's Work (Column A)**

1. There are many devices available to a writer to express the same objective facts. Here, for example, a writer might have written: "the collection includes everything from covered wagons to barouches" or "the collection includes eleven (or ten or eight) types of carriages." That Fields used as his device the same one plaintiff had used (serial listing of the technical names of carriages) is evidence of copying.

1. Bare Facts as related by Abramowitz.

2. There is similarity in Fields' description of Abramowitz' height and shape. The sequence of ideas is the same: physical description, then age, and finally working hours. (Fields' separates age and working hours by one sentence concerning Abramowitz' style of dress.) The same literary device is used in both excerpts (humorous over-statement) of characterizing Abramowitz' 18–20 hour workday as a "cutting down" of his working time because of advanced age.

2. Bare Facts as related by Abramowitz.

| Column C | Column D |
|---|---|
| 3. Plaintiff admits that Abramowitz never made this statement to him, and that he merely "fictionalized" or "extended" facts made known to him by Abramowitz in writing this quotation. The formulation of ideas and phrases are similar in both articles, and the quotation device is used by both when describing the horses as never "letting" Abramowitz "down" and therefore he would not "quit" but would continue to "feed and water" them. | 3. Quotation and therefore not subject to copyright. In any event if it is a simulated quote, plaintiff is estopped from asserting copyright to this. |
| 4. The same incident is described in both articles. This is no mere coincidence because, out of a wealth of incidents in Abramowitz' colorful life to draw from, plaintiff states that he selected seven incidents out of sixteen known to him for inclusion in his article; that Fields included five of these seven incidents and two new ones in his article; that Fields did not include any of the nine that plaintiff had excluded. | 4. Bare Facts as related by Abramowitz. |
| 5. The device here is similar to that used in item No. 3. Abramowitz actually said no more than that a fire burned his stable down in 1930 and that he had no insurance. Plaintiff only slightly extended this by using the quotation device, having Abramowitz saying that he "forgot to take out fire insurance" and connecting this with the "depression". Fields uses the same "quote" and also connects it with the depression. | 5. Quotation and therefore not subject to copyright. In any event if it is a simulated quote, then plaintiff is estopped from asserting a copyright to this. |
| 6. Plaintiff, as in item No. 1, relies on the "variety of literary device" theory. Also, similarity of expression is indicated: "breakneck speed", "racetrack speed", "gaping" spectators and cowboys, "trust" in another's driving abilities, and "Bronx prairie" and "Bronx Cowboy." | 6. Bare Facts as related by Abramowitz, except for the last half of the second sentence which the defendants admit is "original". |

Column C

7. Same device as in items Nos. 3 and 5. Abramowitz actually said everything except that the "donkey made friends with everybody" and, "behaved like a real gentleman".

8. Similarity of incident, sequence and form.

9. Identity in selection of categories advertised out of the inexhaustible number of categories which Abramowitz actually advertised. Especially significant is the choice by Fields of "English woolens" ("worsteds").

Column D

7. Quotation and therefore not subject to copyright. In any event if it is a simulated quote, then plaintiff is estopped from asserting a copyright to this.

8. The statements attributed to Norma and Shirley are quotations. The incident concerning Louis is bare fact, related by Abramowitz.

9. The first sentence is bare fact related by Abramowitz. The second sentence is a quotation. The last sentence has no resemblance except for isolated words to anything Fields has written.

Column E

Abramowitz' Testimony [1]

1. He actually used the precise technical names of each type of carriage in both the Morse and Fields interviews.

2. He told both Morse and Fields that he works 18–20 hours a day, seven days a week.

3. He did state to Morse that he would not "let" his horses "down".

4. He used the term "fruit peddler" in both the Morse and Fields interviews, and discussed the ring incident with both.

[1]. Plaintiff urges that a perusal of Abramowitz' deposition before trial (Plaintiff's Exhibit 9) indicates that Abramowitz did not relate incidents in the same phrasing to different reporters at the time he was interviewed by each nor was he capable of remembering, at the time he testified at trial, the exact phrasing he used at the time Fields interviewed him in describing some of the incidents. (e. g. Abramowitz' use of the term "real (or regular) gentleman" in reference to the donkey in Item 7: See Plaintiff's Exhibit 9, pp. 36–37 and Defendants' Exhibits E and E–1, p. 14.) Abramowitz insisted at the trial, with convincing sincerity that he used the same phrasing in many instances in relating the incidents to both plaintiff and Fields. Abramowitz is an experienced interviewee, having been interviewed at least four times before the Fields interview and he may well nave substantially stereotyped his descriptions and use of language in talking to reporters. (Compare, for example, Abramowitz' description to the plaintiff, quoted in plaintiff's article (Plaintiff's Exhibit 3), of Abramowitz' statement to the late Mayor of New York City, Fiorello H. La Guardia: "Your honor, you should excuse me but you don't know what's going on in the city of New York", with Abramowitz' description to a New York Times reporter (Defendants' Exhibit C) of the statement: "Your honor you should excuse me but you don't know what's going on in the city.") Although I cannot believe that Abramowitz can now remember the exact phrases in all instances that he used in relating the incidents to Fields (See Plaintiff's Exhibit 9, pp. 24, 25, 28, 33, 34, 36–37), nor did Abramowitz claim at trial that he could so remember, I do believe, as Abramowitz testified at trial and at the time his deposition was taken (Plaintiff's Exhibit 9, pp. 12, 14, 23–25, 34), that he did relate all of the accused incidents published in the Fields article to Fields at the interview, specifically using many of the phrases to which plaintiff claims originality. (e. g. that the donkey acted like a "real (or regular) gentleman", and that he was "pushed up" the stairs.)

5. He described this incident to both Morse and Fields and mentioned the lack of fire insurance to both.

6. He fully described this incident to both, and mentioned that the stage-coaches went as "fast as they could go", and that he drove them himself because he did not "trust" any other driver.

7. He described this incident completely to both, including all its essential components: five flights, elevator, birthday party, Dorothy Kilgallen. He insisted that he specifically used the phrase "a real (or regular) gentleman" in describing the donkey to both.

8. He fully described this incident in all its essential details to both Morse and Fields.

9. He related each of the categories included in both articles to both Morse and Fields and specifically stressed the clothing category ("worsteds" or "English woolens") because there is a distinct and colorful story revolving about this category which he related to both.

### Factual Components of Plaintiff's Article and the Protected Residue

#### Column F

| Factual Components | Protected Residue |
|---|---|
| 1. The specific names of each type of carriage (e. g., "phaetons", etc.) | 1. "The collection, which fills five lots includes hundreds * * * (with and without fringes) * * * (only the word "collection" appears in Fields' article). |
| 2. Five feet four, twenty hours a day, seven days a week. | 2. "in perpetual motion among his animals", "pudgy", "bull neck and bowed legs", and the connection between the age of 62 and "cutting down" of working time. |
| 3. Extreme loyalty of Abramowitz to his horses. | 3. Exact phrasing of the quotation (But see column H, item 3 and compare with item 3 in columns A and B.) |
| 4. Fruit peddler, wife Fanny, pawning of ring, price received, purpose of the pawning. | 4. "lovely" (But see column H, item 8, first sentence and compare with item 4, columns A and B, "but at that moment there wasn't a penny in the house. Finally they made a tearful decision—", and last sentence.) (Everything but the first word [in another form] fails to appear in Fields' column.) |
| 5. Failure to take out fire insurance, depression. | 5. Form of quotation. (But see column H, items 4 and 5 and compare with item 5 in columns A and B.) |

| Factual Components | Protected Residue |
|---|---|
| 6. Rodeo, Yankee Stadium, need for equipment, failure to "trust" others, fast driving. | 6. All connective phrases and descriptions. (But see column H, item 6 and compare item 6 in columns A and B.) |
| 7. Five flights, elevator impractical, birthday, Dorothy Kilgallen, donkey acted like a "real" (or regular) "gentleman". | 7. Remaining quotations and the "pushing" of the donkey "up" the stairs. (But see column H, item 7 and compare with item 7 in columns A and B.) |
| 8. Norma, sale for graduation dress, Shirley, encyclopedia, Louis, three years of college, Abramowitz' failure to admit his actions. | 8. Arrangement of these facts and their specific phrasing. (But see Column H, item 8 and reference to his farmer-son "in Conn." in column H, item 2 and compare with item 8, columns A and B.) |
| 9. Use of carriages for advertising movies, stores, politicians, clothing, delicatessen. | 9. Humorous phrasing of the quotations and phrase "from bread to worsteds". (But see column H, item 9 and compare with item 9, columns A and B.) |

### Comparison of Fields' Notes and Article

| Column G | Column H |
|---|---|
| Article | Notes |
| 1. He has the largest collection of carriages, buckboards, surreys, phaetons, tallyhos, barouches, landaus, or pony expresses in the country, if not in the world. His collection even includes a horse trolley and a German funeral coach. | 1. I'm only one who has old-fashioned carriages—more than anyone in N. Y. I got four places— all the Bronx, (p. 1.) Hiring out all kind of wagons, carriages, ponies, donkeys, goats. (p. 1.) So many carriages I can't count them. Pony expresses. Stage coaches. Wells fargo—buckboards covered wagons—barouches so many who could remember the names of them. Tallyhos—phaetons, surreys, victorias, broughams. (pp. 1, 2.) Even has a horse trolley. This I'll not hire out—she's just a relic. (p. 3.) Most I paid for one was $850 for a German funeral coach. (p. 4.) |
| 2. Hopalong is a stocky, bow-legged five feet four, and always dresses in cowboy clothes. When necessary he'll draw on his wide assortment of derbies and high | 2. For Mule Train Hopalong got dressed in his cowboy outfit— I got plenty of them. (p. 2.) Besides cowboy outfit dresses with derbies when necessary—a hi hat |

Column G | Column H

**Article** | **Notes**

·hats and outfit himself properly booted and spurred as an English coachman. Even at 63, with three grown children and five grandchildren, his energy is astonishing. Last year he slowed up; he cut his working hours to 18 a day, but still labors seven days a week.

—English coachman's hat—I don't know myself how many. (p. 3.)

A short stocky man (p. 1) 5'4"—stocky bald gentle soft spoken. (p. 2.)
Has 3 children and 5 grandchildren—one daughter a widow. (p. 3.) One son—2 dauters—son runs a farm in Conn. (p. 4.) I'm active 20 hrs/day—7 days a week. (p. 2.)

3. Well, why don't you quit? "Quit!" The word was like a slap. "All my life I have been around horses. Born and raised in it. Business or no business, the animals you got to clean and feed and water them. They never let me down. Why should I let them down?"

3. Why do you stay in it? It's only one line I know. Business or no business there's animals you got to take care of them. They got to be clean, feed and watered. Never they let me down. (p. 2.) All my life was around horses born and raised in it. (p. 1.) A man is born and raised in horses how can he stop. (p. 5.)

4. & 5. After a whirl as a fruit peddler he pawned the engagement ring of his pretty wife, Fanny, for $100 and began his horse and wagon empire. He ran his $100 ante up to almost $300,000 worth of wagons, horses, stables, plus some real estate. But he lost it all in a fire and a depression. "I forgot to take out fire insurance," he says "and nobody ever invented depression insurance."

4. & 5. Started business with my Fanny's $100 ring. I pawned it. (p. 1.) Once I own garage houses $300,000 worth but fire cleaned me out. (p. 1.) Years back I used to have close to 300 horses. (p. 2.) When fire I forgot to take out insurance & no depression insurance. (p. 2.) When fire cleaned him out nobody invented depression insurance. (p. 5.)

6. Not too long ago a rodeo at Yankee Stadium needed a covered wagon and the proper horses to go with them. Naturally they rented them from Harry, "Hopalong" Abramowitz, the Bronx Cowboy. Hopalong drove the wagon at race-track speed around the stadium to the gaping admiration of cowboys and spectators alike. "When it comes to big stuff like a rodeo or parade," Hopalong says, "I don't trust any driver. I drive myself."

6. Once at rodeo in the stadium they needed a covered wagon with the rt horses—who they ask Hopalong. Naturally. I drive wagon like I'm on a racetrack all ard stadium—everybody cowboys the people everybody claps and their mouths is open they admire a good rider. (p. 4.) (p. 5). I drive myself I don't trust any driver when it comes to big stuff rodeo or parade. There isn't any good drivers." (p. 3.)

## Column G

### Article

7. "Ah," he adds with a sigh, "years back they hired them only for pleasure. Now * * * it's all crazy. When Dorothy Kilgallen has a birthday party I got to push a donkey up five flights of stairs. He wouldn't go in the elevator. But in the party he acts like a regular gentleman."

8. Yet, with his great love for his animals, he sold one of his best horses so his kids could have a set of encyclopedias. He sold another so one of his daughters could have a new dress for her graduation prom. And he sold a flock of his animals to pay three years of college bills for his son. He never said anything about it. It was like parting with his own hide.

9. Along with his stock of 25 horses, 20 donkeys and ponies, and a dozen goats, Hopalong rents them out to advertise delicatessens, supermarkets, movies, political candidates, or English woolens. He also rents them to peddlers, junkmen and TV shows.

## Column H

### Notes

7. yrs back they used to hire them for pleasure. (p. 1.) But crazy stunts too. (p. 2.) Long ago they hire carriages only for pleasure—now it's real crazy—stunts all stunts. Dorothy Kilgallen has a party she wants a donkey. The donkey is stubborn. He doesn't want to go in elevator. So I got to push him up five flights stairs. But in the party he's no disgrace. He acts like a regular gentleman. (p. 5.)

8. Talked to wife Fanny a pretty woman tho a grandmother. Told how he loves his animals when fire cleaned him out—nobody invented depression insurance so Harry she sd sells a horse to buy the kids encyclopedias. When my daughter graduates he sells more to buy her a dress. He has 300 horses once but he sold lots to put our boy thru college. (p. 5.)

9. Rents them out to movies, supermarkets, pol rallies hires carriages and his donkeys and horses—all the delicatessens theeayters TV—junkmen, restaurants. * * * They go on TV, a political campaign * * to advertise woolens and worsteds (p. 1.). Peddlers—junkmen, laundry emergencies things like that. (p. 2.) mostly to advertise movies, supermarkets, worsteds to junkmen, peddlers rallies, (p. 2.) 25 horses—work horses. (p. 2.) Inventory—25 horses, 20 donkeys and ponies. (p. 2.) Hiring out all kinds of wagons—carriages ponies donkeys goats. (p. 1.)

## Sequence, Selection and Emphasis of Incidents
## in Both Articles

| Column J | Column K |
|---|---|
| Morse's Article | Fields' Article |

1. An incident concerning the transportation of a frog by Abramowitz in a stagecoach along Fifth Avenue. Not included either in Fields' notes or article.

1. Yankee Stadium incident. (No. 12 in Morse sequence, column J.) (See column B, item 6.)

2. Types of carriages included in collection (Column A, item 1.)

2. Types of carriages included in collection. (See column B, item 1.)

3. Advertising categories. (Column A, item 9.)

3. Advertising categories. (See column B, item 9.)

4. Physical description, age and workday. (Column A, item 2.)

4. An incident emphasized by Fields concerning a television appearance of one of Abramowitz' donkeys. This is not included in Morse's article.

5. "Letting down" quote. (Column A, item 3.)

5. Hayride business of Abramowitz. Not included in Morse's article.

6. Fruit peddler phrase, then incident concerning wholesaling of apples by Abramowitz. The wholesaling incident is not included either in Fields' notes or article. (Column A, item 4, first phrase.)

6. Kilgallen party. (No. 15 in Morse sequence, column J.) (See Column B, item 7.)

7. Pawning of the engagement ring. (Column A, item 4.)

7. An incident concerning former Postmaster Goldman. This is the major anecdote in Fields' article and notes from the standpoint of literary emphasis. It is not included in the Morse article.

8. History of how Abramowitz built up his business on a shoestring by almost simultaneous purchases and sales of horses. This is a major part of the article. It is not included in either Fields' notes or article.

8. Physical description, age, clothing (not included in Morse article), and workday. (No. 4 in Morse sequence, Column J.) (See Column B, item 2.)

9. An incident concerning a large carriage purchase from the Vanderbilt estate. Copying is not charged as to this.

9. Fruit peddler phrase. (See Column B, item 4.)

Column J Column K

Morse's Article Field's Article

10. The stable fire. (Column A, Item 5.)

10. Pawning of engagement ring. (No. 7 in Morse sequence, Column J.) (See Column B, item 4.)

11. An incident concerning Mayor LaGuardia and Abramowitz. This is the major anecdote in the article. It is not included in Fields' notes or article.

11. Stable fire (No. 10 in Morse sequence, Column J.) (See Column B, item 5.)

12. Yankee Stadium incident. (Column A, item 6.)

12. Sacrifices for children. (No. 16 in Morse sequence, Column J.) (See Column B, item 8.)

13. An incident concerning anniversary of City of Yonkers. Not included in Fields' notes or article.

13. Discussion of other stable and wagon competitors, repair work, and Abramowitz' declining business. This is a major sequence in Fields' article, and is not included in the Morse article.

14. An incident concerning a Sarah Lawrence College portrayal of the Nativity. This is cryptically referred to in Fields' notes, but is not included in his article.

14. "Letting down" quote. (Column B, item 3.) This made to follow logically from Fields' sequence No. 13 (declining business). (See No. 5 in Morse sequence, Column J.) Fields' quote is substantially included in his notes.

15. Kilgallen birthday party. (Column A, item 7.)

16. Sacrifices for children. (Column A, item 8.)