**Maximilian ILYIN, Plaintiff,**

**v.**

**AVON PUBLICATIONS, Inc., Defendant and Third-Party Plaintiff,**

**Philip Rahv and William Phillips, Third-Party Defendants.**

United States District Court
S. D. New York.
July 24, 1956.

Borris M. Komar, New York City, for plaintiff.

William Gold, New York City, for defendant (P. Berner, P. Gitlin, New York City, of counsel).

No appearance for third-party defendants.

THOMAS F. MURPHY, District Judge.

This is an action for copyright infringement and a third-party action for indemnification by the defendant publisher against the persons who allegedly gave it the right to publish the article in question—an English translation of Jean Cocteau's one-act play entitled, "The Human Voice." The facts are as follows:

On February 21, 1930, Librairie Stock Delamain & Boutelleau published, in France, Cocteau's play "La Voix Humaine." The following month it applied for and received a United States copyright (Class D pub. No. 5308) on this work. In November of the same year The Atlantic Monthly Company received a copyright (Class B No. 90470) on the entire November 1930 issue of its magazine which issue contained an English translation of the play under the title "Over the Wire."

The plaintiff, also known as Maximilian Abramowicz, and Cocteau entered into a contract in Paris on September 25, 1935, whereby Cocteau "assigned" to the plaintiff "for a period of twenty-one (21) years from this date, the rights to produce, exploit and present publicly, sound and talking motion pictures, in all languages, for all countries, said films to be based upon the one act play entitled: 'The Human Voice.'" This was supplemented on October 19, 1935, by a letter from Cocteau to the plaintiff granting the latter "by this letter, the exclusive rights to the aforementioned play, for the translation, publication, adaptation, staging and recording of this work, in all languages and for all countries, outside of France." The plaintiff thereafter translated the play and received a United States copyright (Class D unp. No. 90534) in September 1944 after filing one copy of the translation with the Register of Copyrights.

In November of 1947 Bowden Broadwater, Editorial Assistant of the Partisan Review, wrote to Librairie Stock seeking permission "to translate for publication in the Partisan Review" Cocteau's play. Such authorization was granted by letter dated December 5, 1947. The play was thereupon translated by Dudley Fitts who was paid the sum of $62 for his services. There is no evidence that Mr. Fitts had access to or copied plaintiff's translation. This translation was published in the July 1948 issue of the Partisan Review and a copyright on the entire issue (Class B No. 152365) was claimed on August 31, 1948. The plaintiff eventually became aware of this and in March of 1950 caused the William Morris Agency to write to Partisan Review informing them of plaintiff's alleged exclusive pub-

lication rights and requesting an explanation. The reply disclaimed all knowledge of Mr. Ilyin and referred to the license granted by Librairie Stock.

On November 20, 1950, plaintiff wrote the following letter to Librairie Stock:

"I permit myself to recall to you the following facts:

"a. I have purchased directly from the author the rights to 'La Voix Humaine', a one act play of Jean Cocteau, for the films, radio, television and publication. These rights were originally assigned to me in all languages for all countries.

"b. I have made an adaptation of this play in English. This adaptation was copyrighted by me in 1944 and was played for the first time on the English radio by Gertrude Lawrence.

"c. You have equally acquired the rights of publication in all languages for the same play.

"Consequently, as a result of all our conversations, we have arrived at the following:

"1. We have no interest to enter into any controversy, nor to commence a litigation against Mr. Jean Cocteau.

"2. We will unite our efforts for the purpose of publishing abroad this play on advantageous conditions, particularly in the United States.

"3. We will transmit mutually the offers which will be tendered to either of us and will decide by mutual agreement to which publisher we shall give the permission to publish this work.

"I will be very much obligated to you if you will kindly confirm your agreement * * *."

Librairie Stock replied on November 23, 1950, "I confirm to you our agreement to the terms of your letter of November 20, 1950."

Thereafter, on January 24, 1953, Philip Rahv and William Phillips, editors of the Partisan Review, entered into a contract with the Avon Publishing Company, the defendant herein, whereby the latter was granted exclusive rights to print, bind and vend a book entitled "Stories in the Modern Manner from the Partisan Review." The contract also contained clauses to the effect that Rahv and Phillips owned the copyrights and publishing rights of the book materials and that they would hold Avon harmless against any suits or claims of copyright infringement.

Partisan Review wrote to Librairie Stock on March 10, 1953, enclosing a check for $35.70, one-half the advance royalty due for the use of Cocteau's play "in a collection of Partisan Review stories the Avon Publishing Company is bringing out here this summer in pocketbook form." The check was deposited upon receipt, but on April 27 Librairie Stock replied, "We do not recall, and moreover we find no record in our files, of having granted you an authorization for this * * *. [T]here was no question at all of our having granted exclusive rights, much less the right to publish this work in book form. Therefore, we should be obliged if you supplied us by return mail with a full explanation. At the same time we reserve the right to take action if this publication took place without proper authorization." The Partisan Review made no reply, but on August 8, 1953, sent another check for $35.70 saying that it was sorry about the misunderstanding but the April 27 letter arrived too late to do anything about it. Sometime prior to August 8, 1953, Stories in the Modern Manner, containing Fitts' translation of "The Human Voice", was published and sold 92,139 copies at 35¢ each at a loss of $2,061.50.

The second royalty check was also promptly deposited to the account of Librairie Stock, but on December 18, 1953, it sent the following letter to Partisan Review:

"We have only now become aware of your letter of August 8, 1953, which, having arrived during the

the summer holidays and containing a check, was, as is usual in such cases, sent to our accountant.

"We are absolutely not in agreement on the *extension* that you give to the right we had granted Partisan Review to publish in its pages the American translation of Jean Cocteau's 'The Human Voice' done by Mr. Bowden Broadwater. This simple authorization could in no case confer the right to publish this play in a 'pocket-book' edition of 100,000 copies!

"Following your first letter of March 10, 1953, *we had immediately reserved all our rights in connection with this publication,* while waiting for the explanation you might have to offer.

"Now, your letter of August 8 proves to us that the initiative you have taken is completely contrary to publishing rules, and we regret that we are obliged in consequence to allow Mr. Maximilian Ilyin—who holds with us all the publication rights to the American translation of Mr. Cocteau's play—to act * * *. Being unable to return to you the sum of $70.40 which you sent us, we are keeping it under a provisional account."

The answer alleges thirteen separate defenses. Those meriting any discussion may be condensed into four general categories: (1) defendant's publication did not constitute an infringement since it was made with the express authorization of a licensee of the copyright proprietor; (2) plaintiff cannot maintain this suit because of his failure to comply with certain of the formal provisions of the copyright act pertaining to the filing of copies and the notice of claim; (3) plaintiff's copyright is of no effect because his translation was made without the consent of the copyright proprietor; and (4) plaintiff cannot maintain this suit because he is not the real party in interest and because he has failed to join as indispensable parties Librairie Stock and the Atlantic Monthly.

From the facts as set forth above there can be absolutely no doubt that Avon was wholly unauthorized in publishing "The Human Voice" in its Stories in the Modern Manner. Its permission came solely from Rahv and Phillips, but such permission was not within their power to give. The original authorization sought from Librairie Stock in November of 1947 was simply for publication of a translation in the Partisan Review. And this was all that was granted. Partisan Review became a bare licensee, De Forrest Radio Telephone & Telegraph Co. v. Radio Corporation of America, D.C.Del.1925, 9 F.2d 150; Innis, Speiden & Co. v. Food Machinery Corporation, D.C.Del.1942, 2 F.R.D. 261; Ball, Law of Copyright and Literary Property, § 236 (1944), without any right to assign its privilege. Troy Iron & Nail Factory v. Corning, 1852, 55 U.S. 193, 216, 14 L.Ed. 383; Hapgood v. Hewitt, 1886, 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369; Rock-Ola Mfg. Corporation v. Filben Mfg. Co., 8 Cir., 1948, 168 F.2d 919; Ball, op. cit. supra, § 236. The correspondence between Librairie Stock and Partisan Review in 1953 makes it abundantly clear that permission to reprint the translation of the play in book form was never even requested, let alone granted. The mere fact that Partisan Review secured a copyright on its July 1948 issue in which the Cocteau play appeared gives it no right to authorize a reprint by Avon. A blanket copyright on an issue of a periodical does not give any rights to a particular article unless such rights had been previously assigned to the publisher. Mail & Express Co. v. Life Pub. Co., 2 Cir., 1912, 192 F. 899; Kaplan v. Fox Film Corporation D.C., S.D.N.Y.1937, 19 F.Supp. 780; Morse v. Fields, D.C.S.D.N.Y.1954, 127 F.Supp. 63.. Defendant Avon is a wrongful infringer, and if liable to the plaintiff is entitled to indemnification from Rahv and Phillips according to the terms of the January 24, 1953, contract between them.

With respect to the second and third defenses mentioned above, the

short answer is that the validity of plaintiff's copyright is immaterial since he is seeking to recover on the basis of the Librairie Stock copyright. This is so because there is no evidence of any copying, printing, publishing or vending of plaintiff's translation. His theory of action (although inarticulately expressed in the complaint) is that as assignee or exclusive licensee of the translation and publication rights in this country, he has a right to object to any unauthorized translation or publication whether or not it infringes his own copyright.

Nevertheless, since the validity of plaintiff's copyright has been put in issue there is no harm in disposing of the matter. Those defenses which raise the question of compliance by the plaintiff with certain formal provisions of the Copyright Act, 61 Stat. 652, 17 U.S.C. § 1 et seq., are without merit. Objection is made that only one copy of the translation was filed instead of two. Suffice it to say that plaintiff secured an unpublished copyright pursuant to § 12, with the requirements of which he has fully complied. Objection is further made that while this may have initially been the case plaintiff later published the translation and, therefore, was required to file further copies pursuant to § 13. In support of this proposition defendant points to certain questions and answers contained in plaintiff's pre-trial examination. They are as follows:

> "Q. Mr. Ilyin, did you sell any of them? A. Was not for sale—shall be given to publication, to publishers, to television companies, film companies and to stage companies—it was not for sale.
>
> "Q. Did you offer these copies for sale? A. Yes."

After listening to the testimony at the trial, I find as a fact that while plaintiff did have some 100 copies of his translation mimeographed in 1944 these were not offered for sale but merely distributed to certain theatrical producers free of charge in an effort to induce them to produce the work. This was not a publication within the meaning of the act. Heim v. Universal Pictures Co., 2 Cir., 1946, 154 F.2d 480; Basevi v. Edward O'Toole Co., D.C.S.D.N.Y.1939, 26 F. Supp. 41. Therefore, plaintiff need not be troubled by § 13.

Another issue raised concerns the sufficiency of the claim of copyright appearing on plaintiff's translation. The cover of the mimeograph contains the following language:

> "*The Human Voice*
> Play in one act
> by
> Jean Cocteau
> Adapted from the French
> by
> Maximilian Ilyin
> Copyright 1944"

Defendant claims this notice is insufficient under §§ 10 and 19. Even if this be so (and I would be inclined to hold otherwise) the objection is not well taken for the reason that plaintiff, as the owner of an unpublished copyright, is not concerned with these sections.

It is also alleged by way of defense that plaintiff's translation was made without the consent of the copyright owner or proprietor and was, therefore, ineligible for copyright under § 7. If, as plaintiff claims, Cocteau was the real copyright proprietor, then such consent was clearly granted by the letter of October 19, 1935, supplementing the prior contract between the parties. If on the other hand Librairie Stock was the proprietor then it is true that there is no direct evidence of its consent to the translation in 1944. Nevertheless, the understanding between plaintiff and Librairie Stock evidenced by their letters of November 20 and 23, 1950, and the letter of Librairie Stock to Partisan Review dated December 18, 1953, are more than sufficient to constitute a ratification of plaintiff's action, at least as against a third-party infringer.

The last defense is that plaintiff is not the real party in interest and that the suit must be dismissed for failure to join the Atlantic Monthly and

Librairie Stock as indispensable parties. This lacks substance with respect to the Atlantic Monthly. The latter's name is brought into this action solely by virtue of the copyright on its November 1930 issue which contained a translation of the Cocteau play. For all that appears it may have been an infringer or a bare licensee. Its blanket copyright affords it no additional rights over and above those granted to it by the copyright owner or proprietor. Mail & Express Co. v. Life Pub. Co., supra; Kaplan v. Fox Film Corporation, supra; Morse v. Fields, supra. In view of the prior copyright secured by Librairie Stock and the total absence of any evidence to indicate that Atlantic Monthly acquired any rights to the play, other perhaps than those accorded a bare licensee, it is not even a proper party, let alone an indispensable one. Blair v. Lippincott Glass Co., C.C.Ind.1892, 52 F. 226. Western Electric Co. v. Pacent Reproducer Corp., 2 Cir., 1930, 42 F.2d 116, certiorari denied 1930, 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771; Innis, Speiden & Co. v. Food Machinery Corporation, supra; Holliday v. Long Manufacturing Company, D.C. E.D.N.C.1955, 18 F.R.D. 45.

With respect to Librairie Stock the situation is different. On the face of the record it is the copyright proprietor. Plaintiff argues that Librairie Stock, as agent and publisher for Cocteau, copyrighted all of his works in France and elsewhere and merely holds the copyright in trust for Mr. Cocteau, the equitable owner. From this plaintiff contends he received his rights directly from the author and owner of the copyright and thus Librairie Stock drops out of the picture. Aside from the fact that no evidence exists to support this contention, it would avail plaintiff nothing since Cocteau would then become an indispensable party. This is so because even a sole and exclusive licensee may not sue without joining the owner of the copyright. Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 34 L. Ed. 923; Goldwyn Pictures Corp. v. Howells Sales Co., 2 Cir., 1922, 282 F. 9; New Fiction Pub. Co. v. Star Co., D.C.S.D.N.Y.1915, 220 F. 994; Stephens v. Howells Sales Co., D.C.S.D.N.Y. 1926, 16 F.2d 805; Innis, Speiden & Co. v. Food Machinery Corporation, supra; Field v. True Comics, D.C.S.D.N.Y.1950, 89 F.Supp. 611; Holliday v. Long Manufacturing Company, supra. While it is true that the agreement between plaintiff and Cocteau speaks in terms of assignment, it does not satisfy the requirements for an assignment of a copyright, Holliday v. Long Manufacturing Company, supra; Ball, op. cit. supra, § 237, enabling plaintiff to sue by himself. He has merely received a license to exercise certain rights and as an exclusive licensee he must join the copyright owner or proprietor in an infringement suit. Western Electric Co. v. Pacent Reproducer Corp., supra; Buck v. Elm Lodge, Inc., 2 Cir., 1936, 83 F.2d 201.

Vis-a-vis Librairie Stock, plaintiff's position is somewhat ambiguous. The undisputed evidence indicates that the former acquired its copyright in 1930. This raises some doubt as to the validity of the license acquired from Cocteau in 1935. But this curious state of affairs does not create as serious a problem as might first be thought inasmuch as the uncontradicted evidence indicates that Librairie Stock has recognized and acceded to the rights plaintiff received from Cocteau. It has, in effect, consented to become a qualified proprietor. Ball, op. cit., § 216. Plaintiff, to all intents and purposes, is now Librairie Stock's exclusive licensee. At least, there is naught in the record to contradict this assumption.

Thus we are presented with the case of an exclusive licensee seeking to sue a flagrant infringer, yet being unable to do so because of his inability to join the foreign copyright owner as an indispensable party. Is he without relief? Equity will not permit a wrong to remain unrighted if there is any possible way to remedy the situation. Since it appears that Librairie Stock is outside the jurisdiction of this court we think the solution adopted by the Supreme

Court in Independent Wireless Tel. Co. v. Radio Corporation of America, 1926, 269 U.S. 459, 474, 46 S.Ct. 166, 70 L.Ed. 357, is applicable to this case. Cf. Hoffman v. Santly-Joy, D.C.S.D.N.Y.1943, 51 F.Supp. 778; Hoffman v. Santly-Joy, D.C.S.D.N.Y.1943, 51 F.Supp. 779; Field v. True Comics, supra; Holliday v. Long Manufacturing Company, supra.

Accordingly, the complaint must be dismissed for failure to join an indispensable party, but the decree will be left open to enable plaintiff to request the copyright proprietor to join as a co-plaintiff. If such a request is refused the plaintiff may serve the copyright proprietor with a notice of suit and make it an involuntary party plaintiff. Federal Rules of Civil Procedure rule 19(a), 28 U.S.C.A. This will afford the involuntary party full opportunity to protect its rights as well as protect the defendants from multiplicity of actions.

Decree accordingly.