**Don McGUIRE, Plaintiff,**

v.

**UNITED ARTISTS TELEVISION PRODUCTIONS, INC., a corporation, Columbia Broadcasting System, Inc., a corporation, General Foods, a corporation, Defendants.**

**Civ. No. 65–993.**

United States District Court
S. D. California,
Central Division.

May 4, 1966.

Simon, Sheridan, Murphy & Thornton, Los Angeles, Cal., for plaintiff.

Loeb & Loeb, Howard I. Friedman, Los Angeles, Cal., for defendants United Artists Television Productions, Inc. and General Foods.

Gibson, Dunn & Crutcher, Richard H. Wolford, James R. Hutter, Harry L. Usher, Beverly Hills, Cal., for defendant Columbia Broadcasting System, Inc.

### MEMORANDUM

WESTOVER, District Judge.

Plaintiff Don McGuire is a well-known writer, director and producer of films for television. He wrote a motion picture script for television which he entitled McGHEE.

Plaintiff formed a corporation, known as McGuire Company, Inc., of which he

was the sole stockholder. It is unclear whether the McGHEE film was produced by Don McGuire individually or in his corporate capacity. But, in either capacity, Don McGuire sustained the expense of production.

McGuire Company, Inc., sold, assigned and transferred to United Artists Television Productions, Inc. (hereinafter referred to as United Artists) all right, title and interest in and to McGHEE, in which transfer there was no reservation of "creative control" in favor of either Don McGuire individually or McGuire Company, Inc.

United Artists entered into a written contract with Don McGuire to produce a new film of McGHEE, hoping to develop it into a series of episodes for television. Don McGuire was employed to write a new script and to direct the new production which was entitled "A Man Named McGhee." United Artists gave Don McGuire authority to write the new script, to select all actors portraying the various characters, and to direct and produce the new film, United Artists' only contribution thereto being payment of the bills.

On its Summer Playhouse television program General Foods Corporation sponsored the showing of "A Man Named McGhee." In preparing the film for General Foods' sponsorship it was discovered that sufficient space had not been allocated in the film for commercials desired by the sponsor; hence it was necessary to "cut" (portions of the film had to be deleted) the film to accommodate the commercials. United Artists engaged to do this work the same cutter who had theretofore been employed by Don McGuire in producing "A Man Named McGhee."

Before exhibition of the film under sponsorship of General Foods for release over the Columbia Broadcasting System Don McGuire filed this action, demanding an order of court restraining exhibition of the film unless the film was shown exactly as plaintiff produced it. The demand for restraining order was denied, and the film was shown with the deletions having been made.

Thereafter this action came on regularly for trial, plaintiff contending that he had "creative control" of "A Man Named McGhee" and the film could not, therefore, be cut or "mutilated" in any manner without his consent first being obtained.

The contracts entered into between United Artists and Don McGuire and between United Artists and McGuire Company, Inc. did not grant and did not reserve to Don McGuire or to McGuire Company, Inc. "creative control." But evidence at the trial did establish United Artists' willingness to give to Don McGuire some measure of "creative control." Unfortunately, the parties were never able to agree upon what that measure of "creative control" was to be.

At least three attempts were made to reduce to writing the parties' understanding of the term "creative control." United Artists presented to Don McGuire two, separate drafts outlining its concept of the term. Don McGuire reduced to writing his ideas on the subject. Neither party was willing to accept the definition of "creative control" as presented by the other. "A Man Named McGhee" was produced and exhibited without the parties ever agreeing upon the meaning or extent of "creative control."

Witnesses at the trial testified that although the phrase "creative control" had never been reduced to definition, the term is, nevertheless, widely used in the industry. Plaintiff contends creative control extends through the entire life of a film and for so long as it is exhibited.

The ordinary meaning of the phrase would seem to be "control of the creation." When a film has been "created"—that is, when it has been authored, filmed, edited, dubbed and finally put "in the can" ready for distribution for showing, its "creation has been completed and finished, and "creative control" ordinarily has come to an end. Whether there is further "creative control" is to be determined by agreement between the parties.

This Court does not now reach a definition of nor place a limitation upon the term "creative control", for in the transaction at bar the parties never came to a meeting of the minds and never arrived at a mutual consent to or understanding of the meaning or scope of the term.

There is no doubt that creative control does exist in the industries involved in this action, but what it is and to what extent it applies is illusionary in the negotiations between the parties at bar. As a result, judgment must be for defendants on the issues presented.