Jacob JAEGER, Plaintiff,

v.

AMERICAN INTERNATIONAL PICTURES, INC., Defendant.

No. 70 Civ. 5688.

United States District Court,
S. D. New York.

March 12, 1971.

Hess, Segall, Popkin, Guterman, Pelz & Steiner, New York City, for plaintiff;

Thomas F. Ryan, New York City, of counsel.

Hofer & Rich, and Irwin O. Spiegel, New York City, for defendant.

## OPINION

FRANKEL, District Judge.

This is a suit arising from alleged garbling and distortion in the English version of a German film which appears to be a multi-national addition to the supply of cinematic erotica. Plaintiff has moved for a preliminary injunction. Defendant seeks dismissal of the complaint.

The complaint asserts three "causes of action." In the first of these, plaintiff, a citizen of Israel and a permanent resident of New York, alleges that he is an author of scenarios and a producer and director of motion pictures. In 1968 he directed, and co-authored the script for, "Kamasutra—Vollendung der Liebe" (Kamasutra—Perfection of Love), which was produced by Conti Film, G.m.b.H. (Conti), a German corporation of which plaintiff was then half-owner and an "employee." Conti entered a distribution agreement for the film with Exportfilm Bischoff & Co. (Bischoff), a German corporation. Bischoff assigned the American distribution rights to United Producers Organization (UPO), a California corporation,[1] and UPO in turn assigned those rights to defendant American International Pictures, Inc. (AIP). Around October 1st, plaintiff claims, AIP began exhibiting a version of the film "from which major parts of the picture as originally produced in Germany have been eliminated and in which a segment of approximately 25 minutes in length has been inserted resulting in gross distortion and mutilation of the original screenplay * * *." Since this is being done without his consent, plaintiff claims that "the attribution to him of a mutilated and pornographically altered motion picture" violates his "rights of literary property."

---

1. Defendant describes UPO as a "partnership." The difference is not significant at this time.

These rights, as they are recognized in American decisions, are similar, but not identical, to the "moral rights" of authors that are, plaintiff asserts, "widely recognized in Civil Law countries." He seeks injunctive relief under this first count.

The second "cause of action" adds the allegation that defendant is using plaintiff's name in connection with the "promotion and exploitation of the aforesaid garbled and mutilated version" of Kamasutra. This, plaintiff claims, violates his right to privacy established by section 51 of the New York Civil Rights Law, McKinney's Consol.Laws, c. 6. He seeks $500,000 damages and injunctive relief on this count.

In the third "cause of action," plaintiff charges that AIP, by representing him as director and co-author of the allegedly distorted work, has violated and is violating section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This count is presented as a further basis for injunctive relief.

From the accumulation of affidavits and other materials submitted on the pending motions, the following additional information is presented: Plaintiff states that he has been in the film business for a number of years, including nine in Germany, where he produced the film in question. He speaks highly of his own artistic reputation, and he states that the motion picture about which he sues received excellent critical reviews abroad. Apart from plaintiff's own assertions, there are no independent evidences to attest either his renown or the acclaim received by his movie.

The affidavits develop, but not without some important disputes, the chain of contractual arrangements by which the movie in question came to this country and moved into its present course of distribution and exhibition.

Going back to the inception of the relevant business arrangements, plaintiff's employment contract with Conti Film, dated June 20, 1968, provided in part as follows:

"Mr. Jaeger shall assign to Conti-Film all rights of utilization which have accrued or will accrue to his person by virtue of his activity as director and author for Conti-Film, either at the present time or at the time they shall accrue, without regard to time and place."

On June 22, 1968, Conti entered an agreement with Bischoff assigning the exclusive right of foreign sale of the film to the latter. Relevant provisions of that contract are the following:

"The Licensor [Conti] affirms that he alone and exclusively controls to the extent as is required by this contract all copyrights of utilization, screening and exploitation to * * * Kamasutra.

"The Licensor is responsible for the orderly settlement of all copyright claims of authors, * * * and staff * * *. He shall hold harmless Exportfilm from all claims of third parties.

> *     *     *     *     *     *

"Approval of contracts proposed by Exportfilm must be given by the Licensor * * *.

> *     *     *     *     *     *

"Exportfilm agrees to care for the best possible exploitation of the contract film and in all respects to protect the interests of the Licensor with the conscientuousness [*sic*] of an ordinary businessman.

> *     *     *     *     *     *

"If, to facilitate the sale of the contract film to English speaking countries, an English language version must be made, Exportfilm shall advance the cost and take refund from the share of the Licensor.

"If a synchronized English version of the contract film is being produced on the instigation of Exportfilm, then Exportfilm is entitled to use the receipts from countries to which this version has been or will be delivered to first cover the dubbing cost.

> *     *     *     *     *     *

"Exportfilm shall endeavor at a sale of the contract film in the USA and British Canada to obligate the purchaser to produce an English version for his own account.

"The Licensor shall pay for the recording costs of the English sound negative to be deposited with the German film lab.

"If the purchaser of the contract film for the USA and British Canada produces the synchronization at his own expense, Exportfilm shall receive its 20 or 25% commission from the gross price.

\*　　\*　　\*　　\*　　\*　　\*

Place of jurisdiction for possible litigation arising from this contract is Munich.

"Place of performance is Munich."

Income from the sale of foreign rights of distribution was to be split between Conti and Bischoff.

On March 17, 1970, Bischoff licensed UPO to distribute the film in the "United States, Puerto Rico, Channel [sic] zone of Panama and all ships flying the American flag as well as camps of the Red Cross and Veteran's Clubs of American nationality." UPO paid a flat licensing fee of $27,000 for rights to the distribution of the film. Incorporated in the contract were standardized conditions published by the Export-Union of the German film industry—which, parenthetically, received 1% of the receipts of foreign distribution under the contract between Conti and Bischoff. Among those conditions were the following:

"13. Censorship

\*　　\*　　\*　　\*　　\*　　\*

"Should the censorship authorities of the Territory require cuts exceeding 25% of the total length of the Picture, the right of exhibition shall \* \* revert to the Licensor.

"14. Handling of Negatives and Prints.

\*　　\*　　\*　　\*　　\*　　\*

"Licensee · shall not be permitted to make, or have made, any changes, additions or cuts in or to the prints and titles, unless such changes, additions or cuts are necessary to conform to the requirements of the statutory censorship authorities of the Territory. Even in such case, however, Licensee shall be bound to procure Licensor's prior written approval."

On July 27, 1970, UPO licensed defendant to distribute a version of the film in the United States; no copy of the contract is before the court.

Whatever might be concluded about our problems from the quoted contractual provisions alone, there are substantial other materials that complicate the matter and comprise a considerable part of the barrier to plaintiff's motion for a preliminary injunction. There are many sworn assertions by people in the film industry to the effect that it is a custom of their trade to recognize in American film distributors a right to "re-edit" and otherwise adapt foreign movies for exhibition in this country. There are substantial indications that contractual arrangements for American showings of such movies are made with common understanding and acceptance of this customary practice as a necessary element in the effective exploitation of foreign productions which may, in terms of differing tastes and sensibilities, inevitably require tailoring for American display. But this is by no means undisputed; and if these broad assertions for the defendant stood alone, there would be serious doubt whether they could suffice to bar the relief plaintiff seeks.

However, the claimed custom of the trade is by no means the only weapon in defendant's arsenal. More specifically, there is detailed evidence of arrangements not specifically reflected in the contracts and affecting the right to edit and adapt. Mr. Harvey L. Ross shows that he negotiated with Bischoff for the acquisition of Kamasutra by UPO. He swears (and gives circumstantial detail) that particular and now critical consideration was given in the negotiations (and reflected both in oral understand-

ings and the details of the execution of the contract) to the adaptations of the film for American purposes. He shows that the Bischoff executive with whom he dealt not only understood the necessity for large-scale editing operations, but supplied Ross and UPO with some 300 feet of film of erotic statuary that were not part of plaintiff's film but were sold to the defendant for the precise purpose of incorporation into Kamasutra for American showings. It also offered, for the same purpose, a half-hour of film (likewise no part of the movie here in question) that Ross rejected as "totally unsuitable for the U. S. version of the Picture" because of the explicitness of its eroticism. Ross asserts, moreover, that the supplying of "original music and effects tracks" by Bischoff to UPO was for the specific and understood purpose of facilitating re-editing, and substitution of footage in the process, by the American distributors for American purposes.

The papers go on to show that UPO exercised what it claims was its right to re-edit by eliminating a total of some sixteen minutes from the Bischoff version of the film and adding some fifteen minutes of substituted material. From the papers before the court it is not possible to say whether the deleted scenes were substantially better or worse than the substituted portrayals. In the view the court takes of the matters now presented, this kind of aesthetic judgment is not required.

## I.

The motion to dismiss the complaint, given the familiar rules on such a subject, is not one that need long detain us. Without intimating any views on plaintiff's ultimate chances of success, the court finds enough in his allegations to withstand dismissal at this threshold stage.

Whether or not there is any square counterpart in American law of the "moral right" of artists assertedly recognized on the European continent, there is enough in plaintiff's allegations to suggest that he may yet be able to prove a charge of unfair competition or otherwise tortious misbehavior in the distribution to the public of a film that bears his name but at the same time severely garbles, distorts or mutilates his work. It is at least arguable that there is a claim under the Lanham Act, 15 U.S.C. § 1125(a), in the charge that defendant represents to the public that what the plaintiff had nothing to do with is the plaintiff's product, L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F.2d 649 (3d Cir. 1954); Yameta Co. v. Capitol Records, Inc., 279 F.Supp. 582 (S.D.N.Y.), preliminary injunction vacated on other grounds, 393 F.2d 91 (2d Cir. 1968); cf. Granz v. Harris, 198 F.2d 585, 589–591 (2d Cir. 1952) (Frank, J., concurring). Perhaps a similar species of wrong is defined and reachable under the law of New York and other jurisdictions where the film is being shown. Preminger v. Columbia Pictures Corp., 49 Misc.2d 363, 267 N.Y.S.2d 594, 603–604 (Sup.Ct.1966); see generally Clemens v. Belford, Clark & Co., 14 F. 728 (C.C.N.D.Ill.1883) (Mark Twain).

Defendant's argument for dismissal at this stage because indispensable parties are absent must also be rejected.[2] The reasons for this conclusion are most handily stated by treating the argument in terms of each allegedly indispensable party considered separately.

Conti: It is first argued that since Conti is the German copyright holder, it is automatically an indispensable party in any litigation concerning the copyright. Plaintiff insists, however, that he is not asserting rights under German copyright law; and defendant, for its part, argues at some length that

2. There is a contention also by defendant that the complaint fails for its omission to plead foreign law. This is not a substantial argument. Plaintiff claims he is not relying on German copyright but merely refers to it as an illustration of the "moral right" on an analogue of which his action is premised.

German copyright cannot be enforced in American courts. The court is convinced by both sides: German copyright issues are not before the court.

Defendant also argues that the action seeks to enjoin one of Conti's films, which will inevitably be to Conti's detriment. In this regard, however, it is significant to note that Conti's rights to the film, whatever those consisted of, were transferred to UPO, via Bischoff, for a flat sum; Conti, that is to say, does not have a share of the profits from the American distribution. Conti may have an "interest" in having its name shown in the credits of the film every time it is exhibited but it is nowhere suggested that this is enforceable or compensable in terms of any fixed or minimum number of agreed showings. Conti might also object, as does plaintiff, to having its name associated with a "mutilated" product. But that possibility presents no problems requiring rejection of plaintiff's suit because Conti is not here.

Finally, it is argued that each cause of action "centers around Conti Film, and the rights of parties flow from various contracts made with Conti Film." But plaintiff is not pleading a contract cause of action; he is pleading a variety of tort, an extracontractual right of authors and directors. This is separable from whatever claims Conti might have against defendant; thus there is no need that Conti be joined. 3A Moore, Federal Practice ¶19.10 at 2345.

Conti and Bischoff, defendant argues, may bring suit against defendant for breach of contract; this might lead to inconsistent judgments or, at the least, multiple lawsuits. This is indeed possible, but it does not follow that this suit must be dismissed. While it would be preferable to have all these parties before the court to make a final adjudication of all rights, contractual or otherwise, this is not always possible—especially where the interested parties are foreign people or corporations, apparently not amenable to service in the United States. The court's primary function is to do justice between the parties before it; this function should supersede its obligation to protect parties from multiple lawsuits, or uncertain results. Choctaw & Chickasaw Nations v. Seitz, 193 F.2d 456 (10th Cir. 1951); Reed, Compulsory Joinder of Parties in Civil Actions, 55 Mich.L.Rev. 327, 335–37 (1957). In this case, it is unlikely, because of the cost of international lawsuits, that Conti or Bischoff will even commence suit without some assurance of success; in the view that the court takes of that matter (see *infra*) the court finds that suit by these parties is not a substantial threat.

■ *UPO*: UPO's case is different. The UPO–AIP contract is not before the court, though it is at the disposal of AIP. It may be that UPO shares in the profits from the distribution of Kamasutra. If this is so, then it will be injured, perhaps substantially, by any injunction against the showing of the film. On the papers before the court, however, it is not possible to determine UPO's interest in the litigation. If defendant wishes to pursue this vein of attack the burden is on it to show how UPO will be injured. As things stand now, however, there is no solid basis for finding UPO to be indispensable.

■ *Co-author*: Plaintiff's co-author would appear to have much the same claim against defendant, and it might be useful to have him before the court. Since, however, his interest will not be adversely affected by the decision here— except in the abstract sense that if plaintiff fails to establish any right of action at all, the precedent may work to his co-author's prejudice—he cannot be considered indispensable. 3A Moore, Federal Practice ¶19.18[2] and cases cited.

■ *Producer and others*: Defendant is concerned that suit may be brought against it by the producer and "others." This claim is too vague and wide-ranging to be a basis for dismissal. The court cannot be aware of what interest unspecified "others" may have, and it is

as yet unclear who—Conti, plaintiff, Richard Rimmel (co-owner of Conti with plaintiff) or any combination of these—was the "producer."

## II.

■ While he withstands the motion to dismiss, plaintiff is not entitled to the preliminary injunction he seeks.

Upon the facts already summarized, it is evident that there are serious questions as to plaintiff's ultimate likelihood of success. There is a persuasive showing that the defendant, as part of the rights acquired from Bischoff, was entitled to make the changes in the film of which plaintiff complains. There is, moreover, substantial doubt at this stage whether plaintiff can ultimately show a mutilation or distortion in any sense material to his asserted theories. While it may be doubted that the case should ever turn upon judicial views of the aesthetic merits of erotic movies, the plaintiff, to obtain an injunction or to recover any more than nominal damages, will probably have to show either that the substitutions of which he complains are markedly inferior to what he produced or that they, although not inferior, do not fit in with the movie as an artistic whole. See *Preminger, supra*, 267 N.Y. S.2d at 603–604. Plaintiff's cases which seem to hold that false attribution is *per se* an enjoinable violation of an author's rights, see *Granz, Clemens, supra*, and Drummond v. Altemus, 60 F. 338 (C.C.E.D.Pa.1894), do not require a contrary conclusion. Those were all cases involving the work of a single author (in the case of *Granz*, a group of musicians speaking as one through their leader) and the considerations there differ substantially from those in a large-scale collaborative work like a movie.[3]

The prospects are further clouded for the plaintiff by certain oddities and ambiguities in his explanation of what film he is talking about when he posits an original product of high merit and charges a mutilation of that product. The complaint, it will be recalled, refers to "a motion picture originally produced and released in 1968 in Germany," and gives the title of that work in German. In his motion papers, on the other hand, plaintiff seeks to bar exhibition in the United States of "any version" of the motion picture "other than the English version authorized to be released in the United States by Conti Film * * *." Taxed by defendant with this possible discrepancy, plaintiff has supplied a post-argument affidavit telling about a distinction between an "original German version" and an "original English dubbed version" of the movie. He seems to explain, then, that the original film was made "in Germany with actors speaking the English language (but with a German accent); and the remainder was filmed in India with Indian actors speaking the English language (but with an Indian accent) and a voice narration * * * added in the German language * * *." He says that "[f]or purposes of distribution in Germany, [he] translated the English dialogue of the film into German and * * * supervised the dubbing of said film into the German language which, together with the German language narration referred to [earlier] * * *, resulted in the so-called 'original German version' * * *." Defendant argues with some plausibility that there is a certain quality of strain, if not weirdness, in this explanation, to say nothing of the apparent departure from the original allegations. These matters may be amply explained in the ultimate proofs. As of now, however, the cloudiness of the facts upon which plaintiff relies, and particularly the effect of this obscurity upon his charges of "mutilation," comprises a substantial factor against the extraordinary relief he seeks.

3. In Curwood v. Affiliated Distributors, Inc., 283 F. 219 (S.D.N.Y.1922), cited by plaintiff, use of plaintiff's name in conjunction with defendant's motion picture was enjoined, but only after a full hearing and on the trial judge's finding that plaintiff had not intended to contract away his name for such a use. Plaintiff's contractual intent is in this case a hotly contested matter.

The balance of the competing equities leans heavily against the plaintiff. The reputation he seeks to protect may well be a valuable asset both in his own legitimate judgment and on more impersonal and objective criteria. Nevertheless, in the materials thus far presented, this remains a matter only of his own, possibly partial assertion. On the other side, there are powerful arguments showing the severe injury defendant would suffer from the granting of injunctive relief at this time. It is shown without dispute that distribution of the film started last October. Between then and the commencement of this lawsuit, defendant incurred costs of almost $150,-000. Thereafter, in a continuing course of distribution efforts, defendant expended another $95,000 or so from the commencement of the lawsuit to the motion for a preliminary injunction. The movie is now playing or booked for exhibition in some 135 theatres. The cessation of these activities under a preliminary restraint would have obviously substantial and very likely irreparable impact upon defendant and many other interests.

Given the nature of the subject matter and the existence of the commitments thus sketched, the plaintiff has not been notably prompt in the assertion of his rights. While he saw the allegedly distorted film in December and brought his action then, he waited until February to move for injunctive relief. There is a plausible explanation for this in his papers; he claims that it was necessary to procure and marshal papers from Germany in order to present the factual foundation for his motion. Acknowledging the force of this point, the court must nevertheless weigh the developing equities that have continued to grow on the side of the defendant. In the apparent necessities of its enterprise, defendant could not sit by and wait for plaintiff's next steps in the litigation. It appears to have been essential and entirely understandable that distribution efforts, launched last October, should have gone forward as they did. Thus, the people on both sides find themselves where they now stand as a result of reasonable measures taken in the circumstances they confronted. Nevertheless, in assessing that posture for the purposes at hand, the court is compelled to conclude that the potential injury against which the plaintiff seeks protection is far outweighed by the clear and substantial hurt defendant would suffer from the issuance now of a preliminary injunction.

For the reasons outlined above, both motions—defendant's motion to dismiss and plaintiff's for a preliminary injunction—will be denied.

It is so ordered.