Terry **GILLIAM et al.,**
**Plaintiffs-Appellants-Appellees,**

v.

**AMERICAN BROADCASTING**
**COMPANIES, INC.,**
**Defendant-Appellee-Appellant.**

Nos. 913, 1058, Dockets 75–7693, 76–7023.

United States Court of Appeals,
Second Circuit.

Argued April 13, 1976.
Decided June 30, 1976.

Robert C. Osterberg, New York City (Abeles Clark & Osterberg and Ina Lea Meibach, New York City, on the brief), for plaintiffs-appellants-appellees.

Sanford M. Goldman, New York City (Pryor, Cashman & Sherman, Gideon Cashman, Stephen F. Huff, Joseph Z. Epstein, Joel M. Eichengrun, New York City, on the brief), for defendant-appellee-appellant.

Before LUMBARD, HAYS and GURFEIN, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiffs, a group of British writers and performers known as "Monty Python,"[1] appeal from a denial by Judge Lasker in the Southern District of a preliminary injunction to restrain the American Broadcasting Company (ABC) from broadcasting edited versions of three separate programs originally written and performed by Monty Python for broadcast by the British Broadcasting Corporation (BBC). We agree with Judge Lasker that the appellants have demonstrated that the excising done for ABC impairs the integrity of the original work. We further find that the countervailing injuries that Judge Lasker found might have accrued to ABC as a result of an injunction at a prior date no longer exist. We therefore direct the issuance of a preliminary injunction by the district court.

Since its formation in 1969, the Monty Python group has gained popularity primarily through its thirty-minute television programs created for BBC as part of a comedy series entitled "Monty Python's Flying Circus." In accordance with an agreement between Monty Python and BBC, the group writes and delivers to BBC scripts for use in the television series. This scriptwriters' agreement recites in great detail the procedure to be followed when any alterations

are to be made in the script prior to recording of the program.[2] The essence of this section of the agreement is that, while BBC retains final authority to make changes, appellants or their representatives exercise optimum control over the scripts consistent with BBC's authority and only minor changes may be made without prior consultation with the writers. Nothing in the scriptwriters' agreement entitles BBC to alter a program once it has been recorded. The agreement further provides that, subject to the terms therein, the group retains all rights in the script.

Under the agreement, BBC may license the transmission of recordings of the television programs in any overseas territory. The series has been broadcast in this country primarily on non-commercial public broadcasting television stations, although several of the programs have been broadcast on commercial stations in Texas and Nevada. In each instance, the thirty-minute programs have been broadcast as originally recorded and broadcast in England in their entirety and without commercial interruption.

In October 1973, Time-Life Films acquired the right to distribute in the United States certain BBC television programs, including the Monty Python series. Time-

---

1. Appellant Gilliam is an American citizen residing in England.

2. The Agreement provides:

V. When script alterations are necessary it is the intention of the BBC to make every effort to inform and to reach agreement with the Writer. Whenever practicable any necessary alterations (other than minor alterations) shall be made by the Writer. Nevertheless the BBC shall at all times have the right to make (a) minor alterations and (b) such other alterations as in its opinion are necessary in order to avoid involving the BBC in legal action or bringing the BBC into disrepute. Any decision under (b) shall be made at a level not below that of Head of Department. It is however agreed that after a script has been accepted by the BBC alterations will not be made by the BBC under (b) above unless (i) the Writer, if available when the BBC requires the alterations to be made, has been asked to agree to them but is not willing to do so and (ii) the Writer has had, if he so requests and if the BBC agrees that time

permits if rehearsals and recording are to proceed as planned, an opportunity to be represented by the Writers' Guild of Great Britain (or if he is not a member of the Guild by his agent) at a meeting with the BBC to be held within at most 48 hours of the request (excluding weekends). If in such circumstances there is no agreement about the alterations then the final decision shall rest with the BBC. Apart from the right to make alterations under (a) and (b) above the BBC shall not without the consent of the Writer or his agent (which consent shall not be unreasonably withheld) make any structural alterations as opposed to minor alterations to the script, provided that such consent shall not be necessary in any case where the Writer is for any reason not immediately available for consultation at the time which in the BBC's opinion is the deadline from the production point of view for such alterations to be made if rehearsals and recording are to proceed as planned.

Life was permitted to edit the programs only "for insertion of commercials, applicable censorship or governmental . . . rules and regulations, and National Association of Broadcasters and time segment requirements." No similar clause was included in the scriptwriters' agreement between appellants and BBC. Prior to this time, ABC had sought to acquire the right to broadcast excerpts from various Monty Python programs in the spring of 1975, but the group rejected the proposal for such a disjoined format. Thereafter, in July 1975, ABC agreed with Time-Life to broadcast two ninety-minute specials each comprising three thirty-minute Monty Python programs that had not previously been shown in this country.

Correspondence between representatives of BBC and Monty Python reveals that these parties assumed that ABC would broadcast each of the Monty Python programs "in its entirety." On September 5, 1975, however, the group's British representative inquired of BBC how ABC planned to show the programs in their entirety if approximately 24 minutes of each 90 minute program were to be devoted to commercials. BBC replied on September 12, "we can only reassure you that ABC have decided to run the programmes 'back to back,' and that there is a firm undertaking not to segment them."

ABC broadcast the first of the specials on October 3, 1975. Appellants did not see a tape of the program until late November and were allegedly "appalled" at the discontinuity and "mutilation" that had resulted from the editing done by Time-Life for ABC. Twenty-four minutes of the original 90 minutes of recording had been omitted. Some of the editing had been done in order to make time for commercials; other material had been edited, according to ABC, because the original programs contained offensive or obscene matter.

In early December, Monty Python learned that ABC planned to broadcast the second special on December 26, 1975. The parties began negotiations concerning editing of that program and a delay of the broadcast until Monty Python could view it. These negotiations were futile, however, and on December 15 the group filed this action to enjoin the broadcast and for damages. Following an evidentiary hearing, Judge Lasker found that "the plaintiffs have established an impairment of the integrity of their work" which "caused the film or program . . . to lose its iconoclastic verve." According to Judge Lasker, "the damage that has been caused to the plaintiffs is irreparable by its nature." Nevertheless, the judge denied the motion for the preliminary injunction on the grounds that it was unclear who owned the copyright in the programs produced by BBC from the scripts written by Monty Python; that there was a question of whether Time-Life and BBC were indispensable parties to the litigation; that ABC would suffer significant financial loss if it were enjoined a week before the scheduled broadcast; and that Monty Python had displayed a "somewhat disturbing casualness" in their pursuance of the matter.

Judge Lasker granted Monty Python's request for more limited relief by requiring ABC to broadcast a disclaimer during the December 26 special to the effect that the group dissociated itself from the program because of the editing. A panel of this court, however, granted a stay of that order until this appeal could be heard and permitted ABC to broadcast, at the beginning of the special, only the legend that the program had been edited by ABC. We heard argument on April 13 and, at that time, enjoined ABC from any further broadcast of edited Monty Python programs pending the decision of the court.

I

In determining the availability of injunctive relief at this early stage of the proceedings, Judge Lasker properly considered the harm that would inure to the plaintiffs if the injunction were denied, the harm that defendant would suffer if the injunction were granted, and the likelihood that plaintiffs would ultimately succeed on the merits. See *Hamilton Watch Co. v.*

*Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953). We direct the issuance of a preliminary injunction because we find that all these factors weigh in favor of appellants.

There is nothing clearly erroneous in Judge Lasker's conclusion that any injury suffered by appellants as a result of the broadcast of edited versions of their programs was irreparable by its nature. ABC presented the appellants with their first opportunity for broadcast to a nationwide network audience in this country. If ABC adversely misrepresented the quality of Monty Python's work, it is likely that many members of the audience, many of whom, by defendant's admission, were previously unfamiliar with appellants, would not become loyal followers of Monty Python productions. The subsequent injury to appellants' theatrical reputation would imperil their ability to attract the large audience necessary to the success of their venture. Such an injury to professional reputation cannot be measured in monetary terms or recompensed by other relief. See *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1189 (E.D.N.Y.1972); *Estee Lauder, Inc. v. Watsky*, 323 F.Supp. 1064, 1067 (S.D.N.Y. 1970).

In contrast to the harm that Monty Python would suffer by a denial of the preliminary injunction, Judge Lasker found that ABC's relationship with its affiliates would be impaired by a grant of an injunction within a week of the scheduled December 26 broadcast. The court also found that ABC and its affiliates had advertised the program and had included it in listings of forthcoming television programs that were distributed to the public. Thus a last minute cancellation of the December 26 program, Judge Lasker concluded, would injure defendant financially and in its reputation with the public and its advertisers.

However valid these considerations may have been when the issue before the court was whether a preliminary injunction should immediately precede the broadcast, any injury to ABC is presently more speculative. No rebroadcast of the edited specials has been scheduled and no advertising costs have been incurred for the immediate future. Thus there is no danger that defendant's relations with affiliates or the public will suffer irreparably if subsequent broadcasts of the programs are enjoined pending a disposition of the issues.

We then reach the question whether there is a likelihood that appellants will succeed on the merits. In concluding that there is a likelihood of infringement here, we rely especially on the fact that the editing was substantial, i. e., approximately 27 per cent of the original program was omitted, and the editing contravened contractual provisions that limited the right to edit Monty Python material. It should be emphasized that our discussion of these matters refers only to such facts as have been developed upon the hearing for a preliminary injunction. Modified or contrary findings may become appropriate after a plenary trial.

Judge Lasker denied the preliminary injunction in part because he was unsure of the ownership of the copyright in the recorded program. Appellants first contend that the question of ownership is irrelevant because the recorded program was merely a derivative work taken from the script in which they hold the uncontested copyright. Thus, even if BBC owned the copyright in the recorded program, its use of that work would be limited by the license granted to BBC by Monty Python for use of the underlying script. We agree.

■ Section 7 of the Copyright Law, 17 U.S.C. § 7, provides in part that "adaptations, arrangements, dramatizations . . . or other versions of . . . copyrighted works when produced with the consent of the proprietor of the copyright in such works . . . shall be regarded as new works subject to copyright . . . ." Manifestly, the recorded program falls into this category as a dramatization of the script,[3] and thus the program was itself

---

**3.** ABC has not argued that the principles of section 7 do not apply because Monty Python's copyright in its unpublished script is a common law copyright rather than a statutory copy-

entitled to copyright protection. However, section 7 limits the copyright protection of the derivative work, as works adapted from previously existing scripts have become known, to the novel additions made to the underlying work, *Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir. 1976), and the derivative work does not affect the "force or validity" of the copyright in the matter from which it is derived. See *Grove Press, Inc. v. Greenleaf Publishing Co.*, 247 F.Supp. 518 (S.D.N.Y.1965). Thus, any ownership by BBC of the copyright in the recorded program would not affect the scope or ownership of the copyright in the underlying script.

■ Since the copyright in the underlying script survives intact despite the incorporation of that work into a derivative work, one who uses the script, even with the permission of the proprietor of the derivative work, may infringe the underlying copyright. See *Davis v. E. I. DuPont de-Nemours & Co.*, 240 F.Supp. 612 (S.D.N.Y. 1965) (defendants held to have infringed when they obtained permission to use a screenplay in preparing a television script but did not obtain permission of the author of the play upon which the screenplay was based).

If the proprietor of the derivative work is licensed by the proprietor of the copyright in the underlying work to vend or distribute the derivative work to third parties, those parties will, of course, suffer no liability for their use of the underlying work consistent with the license to the proprietor of the derivative work. Obviously, it was just this type of arrangement that was contemplated in this instance. The scriptwriters' agreement between Monty Python and BBC specifically permitted the latter to license the transmission of the recordings made by BBC to distributors such as Time-Life for broadcast in overseas territories.

■ One who obtains permission to use a copyrighted script in the production of a derivative work, however, may not exceed the specific purpose for which permission was granted. Most of the decisions that have reached this conclusion have dealt with the improper extension of the underlying work into media or time, i. e., duration of the license, not covered by the grant of permission to the derivative work proprietor.[4] See *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150 (2d Cir.), cert. denied, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968); *G. Ricordi & Co. v. Paramount Pictures Inc.*, 189 F.2d 469 (2d Cir.), cert. denied, 342 U.S.

right, which can exist only after publication. In any event, we find that the same principles discussed below with respect to derivative works adapted from material in which there is a statutory copyright also apply to material in which there is a common law copyright. See *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 88 (2d Cir.), *cert. denied*, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463 (1940); 17 U.S.C. § 2.

The law is apparently unsettled with respect to whether a broadcast of a recorded program constitutes publication of that program and the underlying script so as to divest the proprietor of the script of his common law copyright. See 1 M. Nimmer, Copyright §§ 56.3, 57. Arguably, once the scriptwriter obtains the economic benefit of the recording and the broadcast, he has obtained all that his common law copyright was intended to secure for him; thus it would not be unfair to find that publication of the derivative work divested the script of its common law protection. On the other hand, several types of performances from scripts have been held not to constitute divestive publication, see, e.g., *Uproar Co. v. NBC*, 81 F.2d 373 (1st Cir. 1936), and it is unclear whether a

broadcast of the recording in itself constitutes publication. See M. Nimmer, supra, § 56.3. Since ABC has not objected to Monty Python's assertion of common law copyright in an unpublished script, we need not entertain the question on this appeal from denial of a preliminary injunction. We leave initial determination of this perplexing question to the district court in its determination of all the issues on the merits. This disposition is especially proper in view of the fact that, apart from the copyright claims, there will be a trial of the unfair competition claim.

4. Thus, a leading commentator on the subject concludes:

> If the copyright owner of an underlying work limits his consent for its use in a derivative work to a given medium (e. g. opera), the copyright owner of the derivative work may not exploit such derivative work in a different medium (e. g. motion pictures) to the extent the derivative work incorporates protectible material from the underlying work.

1 M. Nimmer, Copyright § 45.3.

849, 72 S.Ct. 77, 96 L.Ed. 641 (1951). Cf. *Rice v. American Program Bureau*, 446 F.2d 685 (2d Cir. 1971). Appellants herein do not claim that the broadcast by ABC violated media or time restrictions contained in the license of the script to BBC. Rather, they claim that revisions in the script, and ultimately in the program, could be made only after consultation with Monty Python, and that ABC's broadcast of a program edited after recording and without consultation with Monty Python exceeded the scope of any license that BBC was entitled to grant.

▮ The rationale for finding infringement when a licensee exceeds time or media restrictions on his license—the need to allow the proprietor of the underlying copyright to control the method in which his work is presented to the public—applies equally to the situation in which a licensee makes an unauthorized use of the underlying work by publishing it in a truncated version. Whether intended to allow greater economic exploitation of the work, as in the media and time cases, or to ensure that the copyright proprietor retains a veto power over revisions desired for the derivative work, the ability of the copyright holder to control his work remains paramount in our copyright law. We find, therefore, that unauthorized editing of the underlying work, if proven, would constitute an infringement of the copyright in that work similar to any other use of a work that exceeded the license granted by the proprietor of the copyright.

▮ If the broadcast of an edited version of the Monty Python program infringed the group's copyright in the script, ABC may obtain no solace from the fact that editing was permitted in the agreements between BBC and Time-Life or Time-Life and ABC. BBC was not entitled to make unilateral changes in the script and was not specifically empowered to alter the recordings once made; Monty Python, moreover, had reserved to itself any rights not granted to BBC. Since a grantor may not convey greater rights than it owns, BBC's permission to allow Time-Life, and hence ABC, to edit appears to have been a nullity. See *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100 (9th Cir.), cert. denied, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1970); *Ilyin v. Avon Publications*, 144 F.Supp. 368, 372 (S.D.N.Y.1956).

ABC answers appellants' infringement argument with a series of contentions, none of which seems meritorious at this stage of the litigation. The network asserts that Monty Python's British representative, Jill Foster, knew that ABC planned to exclude much of the original BBC program in the October 3 broadcast. ABC thus contends that by not previously objecting to this procedure, Monty Python ratified BBC's authority to license others to edit the underlying script.

▮ Although the case of *Ilyin v. Avon Publications, Inc.*, 144 F.Supp. 368, 373 (S.D. N.Y.1956), may be broadly read for the proposition that a holder of a derivative copyright may obtain rights in the underlying work through ratification, the conduct necessary to that conclusion has yet to be demonstrated in this case.[5] It is undisputed that appellants did not have actual notice of the cuts in the October 3 broadcast until late November. Even if they are chargeable with the knowledge of their British representative, it is not clear that she had prior notice of the cuts or ratified the omissions, nor did Judge Lasker make any finding on the question. While Foster, on September 5, did question how ABC was to broadcast the entire program if it was going to interpose 24 minutes of commercials, she received assurances from BBC that the programs would not be "segmented." The fact that she knew precisely the length of material that would have to be omitted to allow for commercials does not prove that she ratified the deletions. This is especially true in light of previous assurances that the

---

5. Furthermore, the court in *Ilyin* specifically limited the theory to the situation in which ratification was used against a third-party infringer who claimed the proprietor of the derivative work had no copyright in the underlying work. In this case, however, the proprietor of the underlying work, rather than the alleged infringer, contests the ratification.

program would contain the original shows in their entirety. On the present record, it cannot be said that there was any ratification of BBC's grant of editing rights. ABC, of course, is entitled to attempt to prove otherwise during the trial on the merits.

■ ABC next argues that under the "joint work" theory adopted in *Shapiro, Bernstein & Co. v. Jerry Vogel Music, Inc.*, 221 F.2d 569 (2d Cir. 1955), the script produced by Monty Python and the program recorded by BBC are symbiotic elements of a single production. Therefore, according to ABC, each contributor possesses an undivided ownership of all copyrightable elements in the final work and BBC could thus have licensed use of the script, including editing, written by appellants.

The joint work theory as extended in *Shapiro* has been criticized as inequitable unless "at the time of creation by the first author, the second author's contribution [is envisaged] as an integrated part of a single work," and the first author intends that the final product be a joint work. See 1 M. Nimmer, Copyright §§ 67–73. Furthermore, this court appears to have receded from a broad application of the joint work doctrine where the contract which leads to collaboration between authors indicates that one will retain a superior interest. See *Szekely v. Eagle Lion Films, Inc.*, 242 F.2d 266 (2d Cir.), cert. denied, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957). In the present case, the screenwriters' agreement between Monty Python and BBC provides that the group is to retain all rights in the script not granted in the agreement and that at some future point the group may license the scripts for use on television to parties other than BBC. These provisions suggest that the parties did not consider themselves joint authors of a single work. This matter is subject to further exploration at the trial, but in the present state of the record, it presents no bar to issuance of a preliminary injunction.

■ Aside from the question of who owns the relevant copyrights, ABC asserts that the contracts between appellants and BBC permit editing of the programs for commercial television in the United States. ABC argues that the scriptwriters' agreement allows appellants the right to participate in revisions of the script only *prior* to the recording of the programs, and thus infers that BBC had unrestricted authority to revise after that point. This argument, however, proves too much. A reading of the contract seems to indicate that Monty Python obtained control over editing the script only to ensure control over the program recorded from that script.[6] Since the scriptwriters' agreement explicitly retains for the group all rights not granted by the contract, omission of any terms concerning alterations in the program after recording must be read as reserving to appellants exclusive authority for such revisions.[7]

---

**6.** The scriptwriters' agreement, of course, concerns the recorded program as well as the script. BBC's rights under the agreement involve primarily the licensing of the recorded program, not the script itself. Thus, the scriptwriters' agreement would have been the proper and expected place to find any intended authorization for editing of the recorded program.

**7.** *McGuire v. United Artists Television Productions, Inc.*, 254 F.Supp. 270 (S.D.Cal.1966), cited by appellee for the proposition that failure of a writer explicitly to reserve control over a recording of his script automatically forfeits that control, is inapposite. That case involved the question of whether a writer who had been granted an undetermined measure of "creative control" over the script could prevent editing of the film for insertion of commercials. The court found only that the parties had reached no agreement on the scope of the writer's "cre-

ative control." Here, however, that scope is clearly delineated by the agreement that retains for appellants those rights not granted to BBC, and hence, to BBC's licensees.

In a performer's agreement between Monty Python and BBC, the group warranted that any manuscript that it provided to BBC for performance would be either "original material of (its) own which (it) is fully at liberty to use for all purposes of this Agreement . . . or original material which (it) is fully at liberty to use for all purposes of this Agreement by reason of (its) holding all necessary licenses or permissions." ABC contends that somehow this clause provides an implicit right to edit for commercial television because that act would be consistent with the warranty that the parties are "fully at liberty" to use the scripts for any purpose. Judge Lasker found that the performer's agreement was wholly irrelevant to

Finally, ABC contends that appellants must have expected that deletions would be made in the recordings to conform them for use on commercial television in the United States. ABC argues that licensing in the United States implicitly grants a license to insert commercials in a program and to remove offensive or obscene material prior to broadcast. According to the network, appellants should have anticipated that most of the excised material contained scatological references inappropriate for American television and that these scenes would be replaced with commercials, which presumably are more palatable to the American public.

The proof adduced up to this point, however, provides no basis for finding any implied consent to edit. Prior to the ABC broadcasts, Monty Python programs had been broadcast on a regular basis by both commercial and public television stations in this country without interruption or deletion. Indeed, there is no evidence of any prior broadcast of edited Monty Python material in the United States. These facts, combined with the persistent requests for assurances by the group and its representatives that the programs would be shown intact belie the argument that the group knew or should have known that deletions and commercial interruptions were inevitable.

 Several of the deletions made for ABC, such as elimination of the words "hell" and "damn," seem inexplicable given today's standard television fare.[8] If, however, ABC honestly determined that the programs were obscene in substantial part, it could have decided not to broadcast the specials at all, or it could have attempted to reconcile its differences with appellants. The network could not, however, free from a claim of infringement, broadcast in a substantially altered form a program incorpo-

rating the script over which the group had retained control.

 Our resolution of these technical arguments serves to reinforce our initial inclination that the copyright law should be used to recognize the important role of the artist in our society and the need to encourage production and dissemination of artistic works by providing adequate legal protection for one who submits his work to the public. See *Mazer v. Stein*, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954). We therefore conclude that there is a substantial likelihood that, after a full trial, appellants will · succeed in proving infringement of their copyright by ABC's broadcast of edited versions of Monty Python programs. In reaching this conclusion, however, we need not accept appellants' assertion that any editing whatsoever would constitute infringement. Courts have recognized that licensees are entitled to some small degree of latitude in arranging the licensed work for presentation to the public in a manner consistent with the licensee's style or standards.[9] See *Stratchborneo v. Arc. Music Corp.*, 357 F.Supp. 1393, 1405 (S.D.N.Y. 1973); *Preminger v. Columbia Pictures Corp.*, 49 Misc.2d 363, 267 N.Y.S.2d 594 (Sup.Ct.), aff'd 25 App.Div.2d 830, 269 N.Y. S.2d 913 (1st Dept.), aff'd 18 N.Y.2d 659, 273 N.Y.S.2d 80, 219 N.E.2d 431 (1966). That privilege, however, does not extend to the degree of editing that occurred here especially in light of contractual provisions that limited the right to edit Monty Python material.

## II

 It also seems likely that appellants will succeed on the theory that, regardless of the right ABC had to broadcast an edited program, the cuts made constituted an ac-

---

the issue of a preliminary injunction. While we need not express any opinion on that ruling · at this time, it is obvious from a reading of the contract that the sole purpose of the clause relied upon by ABC is to hold BBC harmless from a claim by any party that the Monty Python scripts infringe upon another work.

8. We also note that broadcast of the Monty Python specials was scheduled by ABC for an 11:30 p. m. to 1:00 a. m. time slot.

9. Indeed, the scriptwriters' agreement permitted BBC to make "minor" changes without consulting Monty Python. See note 2, supra.

tionable mutilation of Monty Python's work. This cause of action, which seeks redress for deformation of an artist's work, finds its roots in the continental concept of droit moral, or moral right, which may generally be summarized as including the right of the artist to have his work attributed to him in the form in which he created it. See 1 M. Nimmer, supra, at § 110.1.

■ American copyright law, as presently written, does not recognize moral rights or provide a cause of action for their violation, since the law seeks to vindicate the economic, rather than the personal, rights of authors. Nevertheless, the economic incentive for artistic and intellectual creation that serves as the foundation for American copyright law, *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973); *Mazer v. Stein*, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954), cannot be reconciled with the inability of artists to obtain relief for mutilation or misrepresentation of their work to the public on which the artists are financially dependent. Thus courts have long granted relief for misrepresentation of an artist's work by relying on theories outside the statutory law of copyright, such as contract law, *Granz v. Harris*, 198 F.2d 585 (2d Cir. 1952) (substantial cutting of original work constitutes misrepresentation), or the tort of unfair competition, *Prouty v. National Broadcasting Co.*, 26 F.Supp. 265 (D.Mass.1939). See Strauss, The Moral Right of the Author 128–138, in Studies on Copyright (1963). Although such decisions are clothed in terms of proprietary right in one's creation, they also properly vindicate the author's personal right to prevent the presentation of his work to the public in a distorted form. See *Gardella v. Log Cabin Products Co.*, 89 F.2d 891, 895–96 (2d Cir. 1937); Roeder, The Doctrine of Moral Right, 53 Harv.L.Rev. 554, 568 (1940).

■ Here, the appellants claim that the editing done for ABC mutilated the original work and that consequently the broadcast of those programs as the creation of Monty Python violated the Lanham Act § 43(a), 15 U.S.C. § 1125(a).[10] This statute, the federal counterpart to state unfair competition laws, has been invoked to prevent misrepresentations that may injure plaintiff's business or personal reputation, even where no registered trademark is concerned. See *Mortellito v. Nina of California*, 335 F.Supp. 1288, 1294 (S.D.N.Y.1972). It is sufficient to violate the Act that a representation of a product, although technically true, creates a false impression of the product's origin. See *Rich v. RCA Corp.*, 390 F.Supp. 530 (S.D.N.Y.1975) (recent picture of plaintiff on cover of album containing songs recorded in distant past held to be a false representation that the songs were new); *Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261, 267 (S.D.N.Y.1968).

■ These cases cannot be distinguished from the situation in which a television network broadcasts a program properly designated as having been written and performed by a group, but which has been edited, without the writer's consent, into a form that departs substantially from the original work. "To deform his work is to present him to the public as the creator of a work not his own, and thus makes him subject to criticism for work he has not done." Roeder, supra, at 569. In such a case, it is the writer or performer, rather than the network, who suffers the consequences of the mutilation, for the public will have only the final product by which to evaluate the work.[11] Thus, an allegation that a defendant has presented to the public a "garbled," *Granz v. Harris*, supra (Frank, *J.*, concurring), distorted version of plaintiff's work seeks to redress the very

10. That statute provides in part:
 Any person who shall affix, apply, or annex, or use in connection with any goods or services, . . . a false designation of origin, or any false description or representation . . . and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action by any person . . who believes that he is or is likely to be damaged by the use of any such false description or representation.

11. This result is not changed by the fact that the network, as here, takes public responsibility for editing. See *Rich v. RCA Corp.*, supra.

rights sought to be protected by the Lanham Act, 15 U.S.C. § 1125(a), and should be recognized as stating a cause of action under that statute. See *Autry v. Republic Productions, Inc.,* 213 F.2d 667 (9th Cir. 1954); *Jaeger v. American Intn'l Pictures, Inc.,* 330 F.Supp. 274 (S.D.N.Y.1971), which suggest the violation of such a right if mutilation could be proven.

During the hearing on the preliminary injunction, Judge Lasker viewed the edited version of the Monty Python program broadcast on December 26 and the original, unedited version. After hearing argument of this appeal, this panel also viewed and compared the two versions. We find that the truncated version at times omitted the climax of the skits to which appellants' rare brand of humor was leading and at other times deleted essential elements in the schematic development of a story line.[12] We therefore agree with Judge Lasker's conclusion that the edited version broadcast by ABC impaired the integrity of appellants' work and represented to the public as the product of appellants what was actually a mere caricature of their talents. We believe that a valid cause of action for such distortion exists and that therefore a preliminary injunction may issue to prevent repetition of the broadcast prior to final determination of the issues.[13]

### III

We do not share Judge Lasker's concern about the procedures by which the appellants have pursued this action. The district court indicated agreement with ABC that appellants were guilty of laches in not requesting a preliminary injunction until 11 days prior to the broadcast. Our discussion above, however, suggests that the group did not know and had no reason to believe until late November that editing would take place. Several letters between BBC and Monty Python's representative indicate that appellants believed that the programs would be shown in their entirety. Furthermore, the group did act to prevent offensive editing of the second program immediately after viewing the tape of the first edited program. Thus we find no undue delay in the group's failure to institute this action until they were sufficiently advised regarding the facts necessary to support the action. In any event, ABC has not demonstrated how it was prejudiced by any delay. See *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 574 (2d Cir. 1973).

Finally, Judge Lasker denied a preliminary injunction because Monty Python had failed to join BBC and Time-Life as indispensable parties. We do not believe that either is an indispensable party. ABC argues that joinder of both was required because it acted in good faith pursuant to its contractual rights with Time-Life in broadcasting edited versions of the programs, and Time-Life, in turn, relied upon its contract with BBC. Furthermore, ABC argues, BBC must be joined since it owns the copyright in the recorded programs.

---

**12.** A single example will illustrate the extent of distortion engendered by the editing. In one skit, an upper class English family is engaged in a discussion of the tonal quality of certain words as "woody" or "tinny." The father soon begins to suggest certain words with sexual connotations as either "woody" or "tinny," whereupon the mother fetches a bucket of water and pours it over his head. The skit continues from this point. The ABC edit eliminates this middle sequence so that the father is comfortably dressed at one moment and, in the next moment, is shown in a soaked condition without any explanation for the change in his appearance.

**13.** Judge Gurfein's concurring opinion suggests that since the gravamen of a complaint under the Lanham Act is that the origin of goods has been falsely described, a legend disclaiming Monty Python's approval of the edited version would preclude violation of that Act. We are doubtful that a few words could erase the indelible impression that is made by a television broadcast, especially since the viewer has no means of comparing the truncated version with the complete work in order to determine for himself the talents of plaintiffs. Furthermore, a disclaimer such as the one originally suggested by Judge Lasker in the exigencies of an impending broadcast last December would go unnoticed by viewers who tuned into the broadcast a few minutes after it began.

We therefore conclude that Judge Gurfein's proposal that the district court could find some form of disclaimer would be sufficient might not provide appropriate relief.

Even if BBC owns a copyright relevant to determination of the issues in this case, the formalistic rule that once required all owners of a copyright to be parties to an action for its infringement has given way to equitable considerations. See *Jaeger v. American International Pictures, supra,* 330 F.Supp. at 279; 7 C. Wright & A. Miller, Federal Practice and Procedure, § 1614. In this case, the equities to be considered under Fed.R.Civ.P. 19(a) strongly favor appellants. Monty Python is relying solely on its copyright in the script and on its rights as an author. No claim is being made that Monty Python has rights derived from the copyright held by another. Compare *First Financial Marketing Services Group, Inc. v. Field Promotions, Inc.,* 286 F.Supp. 295 (S.D.N.Y.1968). One of the parties is an English corporation, and any action that appellants, a group of English writers and performers, might have against that potential defendant would be better considered under English law in an English court.

Complete relief for the alleged infringement and mutilation complained of may be accorded between Monty Python and ABC, which alone broadcast the programs in dispute. If ABC is ultimately found liable to appellants, a permanent injunction against future broadcasts and a damage award would satisfy all of appellants' claims. ABC's assertion that failure to join BBC and Time-Life may leave it subject to inconsistent verdicts in a later action against its licensors may be resolved through the process of impleader, which ABC has thus far avoided despite a suggestion from the district court to use that procedure. Finally, neither of the parties considered by ABC to be indispensable has claimed any interest in the subject matter of this litigation. See Fed.R.Civ.P. 19(a)(2).

For these reasons we direct that the district court issue the preliminary injunction sought by the appellants.

GURFEIN, Circuit Judge (concurring):

I concur in my brother Lumbard's scholarly opinion, but I wish to comment on the application of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

I believe that this is the first case in which a federal appellate court has held that there may be a violation of Section 43(a) of the Lanham Act with respect to a common-law copyright. The Lanham Act is a trademark statute, not a copyright statute. Nevertheless, we must recognize that the language of Section 43(a) is broad. It speaks of the affixation or use of false designations of origin or false descriptions or representations, but proscribes such use "in connection with any goods or services." It is easy enough to incorporate trade names as well as trademarks into Section 43(a) and the statute specifically applies to common law trademarks, as well as registered trademarks. Lanham Act § 45, 15 U.S.C. § 1127.

In the present case, we are holding that the deletion of portions of the recorded tape constitutes a breach of contract, as well as an infringement of a common-law copyright of the original work. There is literally no need to discuss whether plaintiffs also have a claim for relief under the Lanham Act or for unfair competition under New York law. I agree with Judge Lumbard, however, that it may be an exercise of judicial economy to express our view on the Lanham Act claim, and I do not dissent therefrom. I simply wish to leave it open for the District Court to fashion the remedy.

The Copyright Act provides no recognition of the so-called *droit moral,* or moral right of authors. Nor are such rights recognized in the field of copyright law in the United States. See 1 *Nimmer on Copyright,* § 110.2 (1975 ed.). If a distortion or truncation in connection with a use constitutes an infringement of copyright, there is no need for an additional cause of action beyond copyright infringement. *Id.* at § 110.3. An obligation to mention the name of the author carries the implied duty, however, as a matter of contract, not to make such changes in the work as would render the credit line a false attribution of authorship, *Granz v. Harris,* 198 F.2d 585 (2 Cir. 1952).

So far as the Lanham Act is concerned, it is not a substitute for *droit moral* which authors in Europe enjoy. If the licensee may, by contract, distort the recorded work, the Lanham Act does not come into play. If the licensee has no such right by contract, there will be a violation in breach of contract. The Lanham Act can hardly apply literally when the credit line correctly states the work to be that of the plaintiffs which, indeed it is, so far as it goes. The vice complained of is that the truncated version is not what the plaintiffs wrote. But the Lanham Act does not deal with artistic integrity. It only goes to misdescription of origin and the like. See *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33, 36 (2 Cir. 1962).

The misdescription of origin can be dealt with, as Judge Lasker did below, by devising an appropriate legend to indicate that the plaintiffs had not approved the editing of the ABC version.[1] With such a legend, there is no conceivable violation of the Lanham Act. If plaintiffs complain that their artistic integrity is still compromised by the distorted version, their claim does not lie under the Lanham Act, which does not protect the copyrighted work itself but protects only against the misdescription or mislabelling.

So long as it is made clear that the ABC version is not approved by the Monty Python group, there is no misdescription of origin. So far as the content of the broadcast itself is concerned, that is not within the proscription of the Lanham Act when there is no misdescription of the authorship.

I add this brief explanation because I do not believe that the Lanham Act claim necessarily requires the drastic remedy of permanent injunction. That form of ultimate relief must be found in some other fountainhead of equity jurisprudence.

1. I do not imply that the appropriate legend be shown only at the beginning of the broadcast. That is a matter for the District Court.